JACOB M. MIDDLEKAUFF ET AL. *v.* R. LEE LE-COMPTE ET AL.

*Fish In Potomac River—Compact With Virginia—Relief By Injunction.*

The compact of 1785, between Maryland and Virginia, which includes a provision that all laws and regulations which may be necessary for the preservation of fish in the Potomac River shall be made with the consent and approbation of both states, has no application to fish in the upper, unnavigable portion of the river, and consequently the concurrence of the Virginia Legislature was not necessary to render effective, as applied to that river, Acts 1924, ch. 340, prohibiting the taking of certain species of fish by fish pots, in any waters of the state above where the tide ebbs and flows.

Under the rule that a court of equity will not give a remedy to preserve a violation of the statute law, an injunction will not issue to prevent the destruction by the state game warden of fish pots placed in a river in violation of a statute, even though the warden has no statutory authority to destroy them.

*Decided January 14th, 1926.*

Appeal from the Circuit Court for Washington County, In Equity (WAGAMAN, J.).

Bill by Jacob M. Middlekauff and others against E. Lee LeCompte, State Game Warden, and another. From a decree for defendants, plaintiffs appeal. Affirmed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Alexander R. Hagner,* for the appellant.

*Robert H. Archer, Jr., Assistant Attorney General,* and *Alexander Armstrong,* with whom was *Thomas H. Robinson, Attorney General,* on the brief, for the appellees.

BOND, C. J., delivered the opinion of the Court.

The appellants, some of whom are residents of Washington County, Maryland, and the remainder of whom are residents of West Virginia, have been maintaining fish-pots in the upper, unnavigable portion of the Potomac River, and upon a threat of destruction or opening of the pots by the Maryland Game Warden and the Deputy Game Warden, under the assumed authority and direction of Maryland statutes on the subject, they applied to the Circuit Court of Washington County for an injunction to restrain such action; and from a decree refusing it, and dismissing their bill of complaint, they have prosecuted this appeal.

An act of the General Assembly of Maryland in 1924, chapter 340, amending sections 73 and 80 of article 39 of the Code on the subject of "Fish and Fisheries," prohibits the taking of any of the species of fish named in the act, "in any of the waters of this State above a point where the tide ebbs and flows with * * * fish pots * * * or by any means or contrivance in the nature of a seine or net or trap," and the obstructing of "any stream above where the tide ebbs and flows, so that fish shall not have free access up and down said stream." Fish pots are contrivances in

the nature of screens and traps placed at the junction of low dams or walls extending out from each shore and somewhat down stream in such a way as to collect the water and send it through the pot, so that the fish may be screened out there. It is an old Indian method of fishing in shallow streams, used by white men since the early history of the colony. Such contrivances would seem to leave little or no chance for escape of any fish going down stream, and the evidence shows that they do screen off all kinds of fish, including bass and others specifically mentioned in the statute. We find the contention that the pots violate the statute amply sustained.

The appellants contend, however, that this statute is not effective because the Compact of 1785 between the State of Virginia and Maryland, in the eighth section, provided that, "All laws and regulations which may be necessary for the preservation of fish * * * in the river Potomac, * * * shall be made with the consent and approbation of both States." Both this Court and the Supreme Court of the United States have held the Compact to be still binding, except in so far as provisions of the United States Constitution have superseded it. *State v. Hoofman,* 9 Md. 28; *Wharton v. Wise,* 153 U. S. 155, 172. And it is conceded that the Maryland Act of 1924 has not been concurred in by the State of Virginia. The appellees contend, however, and the trial judge has agreed, that the Compact of 1785 had no reference to fishing in the upper, unnavigable portion of the Potomac. We have come to the same conclusion.

The Compact of 1785 appears to have been the last of three efforts to settle some definite controversies which arose between the two states during the American Revolution, and which continued until the Compact was effected. The chief grounds of controversy were differences in tolls on shipping and duties, and conflicting views on the jurisdiction of the courts of one state and the other. The Continental Congress, on November 22nd, 1777, recommended a conference

of Maryland, Virginia and North Carolina, to meet in the
following January to consider a wide range of subjects; the
price of labor, manufactures, internal produce and com-
modities imported from foreign countries.   That specific
recommendation came to nothing; but Virginia, by an act
of December 9th, 1777, appointed commissioners to meet
like commissioners from Maryland "to consider the most
proper means to adjust and confirm the rights of each to
the use and navigation, and jurisdiction over the Bay of
the Chesapeake, and the rivers Potomac and Pocomoke, in
order to prevent any difference on these subjects which may
interrupt that desirable harmony between the two countries,
which is equally the interest of both to cultivate."   On
December 22nd, 1777, the General Assembly of Maryland
appointed commissioners in turn; and gave them instruc-
tions on the grounds of controversy.   The general question
of jurisdiction to be settled was described in the instructions
as "the point of jurisdiction over that part of the Bay
lying within the limits of Virginia."   And the commis-
sioners were to endeavor to settle the point by an agree-
ment that piracies, crimes or offences committed on that
part of the bay by Maryland subjects or by persons not
subjects of Virginia, against subjects of Maryland, should
be tried in Maryland; that those committed by subjects of
Virginia, or by persons not subjects of Maryland, against
subjects of Virginia, should be tried in Virginia; that any
person flying from justice from either state, might be taken
upon said water by process from that state, and that pira-
cies, crimes and offences committed by persons not subjects
of either state against other persons not subjects of either
state should be tried in the state in which the offender should
be first caught.   That conference came to nothing.

The final, successful convention was started by the ap-
pointment of commissioners in Virginia by an act passed
on June 28th, 1784, "to frame such liberal and equitable
regulations touching the jurisdiction and navigation of the
waters of Chesapeake Bay, and the rivers Potomac and

Pocomoke, as may be mutually advantageous to the two States." The General Assembly of Maryland, at its November Session, 1784, responded with a resolution appointing commissioners to meet those of Virginia, "for the purpose of settling the navigation of, and the jurisdiction over, that part of the Bay of Chesapeake which lies within the limits of Virginia, and over the rivers Potomac and Pocomoke, and that the said commissioners, or any two of them, have full power, in behalf of this State, to adjust and settle the jurisdiction to be exercised by the said States, respectively, over the said waters and the navigation of the same, * * * and that the said Commissioners be directed to govern themselves in the execution of the trust reposed in them by the instructions of the general assembly, of the twenty-second day of December, seventeen hundred and seventy-seven, and the instructions which shall be given by this assembly." See *Instructions to the Commissioners of Maryland, Votes and Proc. House of Delegates,* 22 Dec., 1777, Resol. 1784, No. 22; *Scharf's History of Maryland,* vol. 2, pages 519, 520, 528, *et seq."*

It would seem from these preliminaries, then, that the only waters with which the joint commission was to be concerned were those on which there was navigation. It will be borne in mind, of course, that the Potomac and the Pocomoke were broad, navigable waterways on the boundary between the two states, where questions of the kind outlined were likely to arise. Nothing was said in the preliminary act or resolution about the preservation of fish; the two legislatures spoke only of points of jurisdiction over the waters, and the navigation of the same.

During this same year, 1784, the two states were arranging for another, distinct joint commission on the question of extending navigation on the upper, and then unnavigable, portion of the Potomac. In August of that year the movement was started by a suggestion of General Washington's, and the convention met in Annapolis on December 22nd, 1784, and its results were embodied in the Virginia Act of

1784, chap. LXXXII, and in the Maryland Act of 1784, Chap. 33, both providing for the formation of the Potomac Company to effectuate the purpose in mind. It was one of the earlier of the steps which ultimately led to the construction of the Chesapeake and Ohio Canal.

Taking up the provisions of the Compact of 1785, the eighth clause taken alone, and read in full, seems to refer only to navigable waters. It is that, "All laws and regulations which may be necessary for the preservation of fish,. or for the performance of quarantine, in the river Potomack, or for preserving and keeping open the channel and navigation thereof, or of the river Pocomoke within the limits of Virginia, by preventing the throwing out ballast, or giving any other obstruction thereto, shall be made with the mutual consent and approbation of both States." And the Compact as a whole seems to confirm this construction. The first five clauses are concerned with vessels, tolls, port charges, freedom of navigation and entry into each state of vessels of given tonnage. The sixth makes the river Potomac a common highway for the purpose of navigation and commerce. The seventh secures to the citizens of each state property and rights in the shores of the Potomac, with the privilege of carrying out wharves and other improvements. so as not to injure or obstruct navigation, adding that "the right of fishing in the river shall be common to, and equally enjoyed by, the citizens of both states." The eighth concerning laws and regulations for the preservation of fish or the performance of quarantine in the river Potomac, has been quoted in full. The ninth concerns lighthouses, beacons, buoys or other necessary signals on these waters, including the Potomac. The tenth is the article covering jurisdiction of crimes committed on the waters. The eleventh concerns the libelling, attaching or seizing of vessels, fugitives and the service of process. And the twelfth concerns transportation of the products of land from one state to the other, and the removal of effects free from any duty, tax or charge.

In 1829, Chancellor Bland, in *Binney's Case,* 2 Bland, 99,
had to consider an argument that the Compact of 1785
established the character of even the stream above tide as
a navigable river and highway common to both states. And
he answered, page 126: "The general scope and object of
that compact was, not to fix and give a legal character to
any natural subject whatever; in that respect it did not
profess to alter or to stipulate for anything; throughout it
speaks of waters, which are by nature navigable; and regu-
lates the terms and manner in "which the natural naviga-
tion is to be conducted by the citizens of the contracting
parties. The first nine articles cannot possibly be applied
in any other way. The tenth establishes certain regulations
respecting piracies, crimes and offences, and for any vio-
lence, injury or trespass, to or upon the property, or lands
of others adjacent to the said bay or river, etc. Piracy
is a name given to no offence committed within the body of
a county; but only to crimes upon bays and rivers, or any
tidewaters, considered as an arm of the sea, not within the
body of a county, but originally and properly within the
jurisdiction of the admiralty. This provision respecting
piracy, therefore, clearly confines the whole article to acts
done on tidewater, or abroad, or not within the body of any
county; and of which the courts of common law could not
otherwise have jurisdiction. The eleventh article speaks
of the ports of the Potomac, certainly on tide-water, for
there could be none above; and of persons flying from justice.
This again must have been upon the tide-water and not
within the body of any county; because the whole of the
river, above tide, not being navigable, or a common high-
way, was within the bodies of the respective adjacent coun-
ties; and could afford no sanctuary to those who should flee
from the justice of municipal law; since they would be there
fully within reach of process from the courts of common
law of the state to which the river belonged. The twelfth
article relates to the transportation of the effects of the
citizens of each state across the river free of duty. But it

could not be necessary to extend this provision higher than. the tide; because a similar stipulation had been previously embodied in the act incorporating The Potomac Company. 1784, ch. 33, s. 19.   There is, therefore, nothing in this. compact, which relates in any manner whatever to the River Potomac above tidewater."

None of the other cases cited appear to have had to do· with the river above tide, and they do not, therefore, determine the point here involved.   *State v. Hoofman,* 9 Md. 28; *Hendricks v. Commonwealth,* 75 Va. 934; *Ex parte Marsh,. et al.,* 57 Fed. 719; *Wharton v. Wise,* 153 U. S. 155.

We find, upon the reasoning stated, therefore, that the· Compact of 1785 did not require the concurrence of the· Legislature of Virginia to render effective the prohibition. against fish pots in the upper Potomac in the Maryland. Act of 1924.

The appellants contend that even if this be true, and the· Act of 1924 be given full effect according to its terms, there· is nothing in it, or elsewhere in the law, which gives the· Game Warden authority to enforce the law by opening and. destroying the fish pots.   To this it seems a sufficient answer· that a court of equity will not give a remedy to preserve a violation of the statute law.   *Maryland Trust Co. v. Mechan- ics' Bank,* 102 Md. 608, 631.

The conclusions already stated seem to dispose of the case· without the necessity of discussing other points made in. argument.

*Decree affirmed, with costs to the appellees.*