# JACK LESTER BARNES *v.* STATE OF MARYLAND

[No. 120, October Term, 1945.]

*Decided April 11, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*John F. Lillard* and *Jerrold V. Powers* for the appellant.

*J. Edgar Harvey, Assistant Attorney General,* and *T. Barton Harrington, Assistant Attorney General,* with whom were *William Curran, Attorney General,* and *A. Gwynn Bowies, State's Attorney for Prince George's County,* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellant, who was not a citizen of Maryland, was indicted by the Grand Jury of Prince George's County, Maryland, for committing a rape on a citizen of Virginia. The crime occurred on August 4, 1945, on a steamboat running on the Potomac River, from Norfolk to Washington, and passing through Prince George's County, although at the time of the crime, the evidence shows it was in the waters of Charles County. Appellant filed a plea to the jurisdiction to which the State's demurrers were sustained. The appellant was then tried and convicted, and after conviction he filed a motion in arrest of judgment. This was overruled and he was sentenced to be hanged, and on the same day noted his appeal.

The questions raised by the appellant have nothing to do with the conduct of the trial, but concern the jurisdiction of the Circuit Court for Prince George's County. It is contended, first, that if that Court has jurisdiction, it has it only by virtue of Section 631 of Article 27 of the Annotated Code, which provides for the prosecution of any person who may commit any indictable offense on a steamboat within the State of Maryland in any county, to or through which the steamboat may run. The last portion of the statute states that in case of bailable offenses, the offender may be held to bail by any justice of the peace in any such county "but such presentation, indictment and trial shall be in the same county and city in which such justice of the peace shall be." It is claimed in the motion for arrest of judgment that the proof shows that the offense occurred outside of Prince

George's County, and it is not shown that the defendant was brought before a justice of the peace in Prince George's County. It is urged that the last is a jurisdictional allegation and must show on the record. There is nothing in the record to show that appellant was ever brought before a justice of the peace anywhere before he was indicted. It is the usual practice to bring such offenders before a justice of the peace, who, after hearing or waiver of hearing, holds them for the action of the grand jury. It is significant that appellant does not allege that he was not brought before a justice of the peace, but merely that the record does not show he was.

The procedure of bringing a person charged with a felony before a magistrate is one of the ordinary processes of justice, and is not usually necessary to give jurisdiction to a court in which a grand jury has indicted him. Under usual circumstances, if the crime occurred within the territorial limits of the county, there would be nothing in the records of the trial before the Circuit Court of that county to show by what means he was apprehended or held for the action of the grand jury. The proceedings would start with the presentment and the indictment. Section 631 of Article 27 is not, in our opinion, intended to require any entry in the court records in cases coming under its provisions. It is intended to give jurisdiction over an offender, coming within its provisions, to the county which first uses the ordinary processes to hold him, preliminary to indictment. If the appellant in this case had alleged and shown, at a proper time and in an appropriate manner during the proceedings, that he had been taken before a justice of the peace and held by the latter in some county other than Prince George's, the question might then arise whether Prince George's County or the other county or both had jurisdiction. But that is not the situation presented. We see no force in this contention of appellant.

Appellant's second contention is much more far reaching. He claims that under the Compact of 1785, made

between the States of Maryland and Virginia, at a time when the states were bound together only by the Articles of Confederation, and before the Constitution of the United States was adopted, offenses of the kind with which he is charged, occurring on the Potomac River, if against a citizen of the State of Virginia, can only be tried in the Courts of Virginia, and that the Courts of Maryland have no jurisdiction over them. The Compact of 1785, made between two sovereign states, at a time when they had the right to enter into such an agreement, was ratified and approved by Chapter 1 of the Acts of 1785 of the General Assembly of Maryland, and was also approved and ratified by Chapter 18 of the Acts of 1786 of the General Assembly of Virginia. A consideration of the circumstances leading up to the Compact and the Compact itself, and the subsequent legislation, and the decisions of this court and the courts of Virginia, and the Federal courts, in relation to the Compact, is necessary in order to decide this question.

In construing a statute, "* * * courts may, with propriety, recur to the history of the times when it was passed; and this is frequently necessary in order to ascertain the reason as well as the meaning of particular provisions in it." *United States v. Union Pac. R. Co.,* 91 U. S. 79, 23 L. Ed. 224. "Statutes should be construed with a view to the original intent and meaning of the makers, and such construction should be put upon them, as best to answer that intention, which may be collected from the cause or necessity of making the Act, or from foreign circumstances; and when discovered ought to be followed, although such construction may seem to be contrary to the letter of the statute." *Ches. & Ohio Canal Co. v. Baltimore & Ohio R. Co.,* 4 Gill & J. 1, at pages 151, 152. This last quotation is repeated in *Frazier v. Warfield,* 13 Md. 279, at page 301. See also *Agricultural College v. Atkinson,* 102 Md. 557, 560, 62 A. 1035; *Riggin v. Wyatt,* 139 Md. 476, at page 478, 115 A. 755; and *Compensation Board v. Albrecht,* 183 Md. 87, at page 94, 36 A. 2d 666. Bearing in mind these well estab-

lished principles of statutory construction, we turn first to an examination of the circumstances and conditions leading up to the execution of the Compact of 1785.

There had been, since the earliest times, boundary difficulties between the province of Maryland and the province of Virginia. These difficulties were based upon contradictory charters granted respectively to Lord Baltimore, on the one hand, and to the London Company, and to Lord Culpepper, on the other. It is not necessary to discuss these boundary questions, except to state that at the time of the Compact, both states claimed the Potomac River, and both also claimed a part of the Chesapeake Bay, and of the Pocomoke River, depending upon the location of Watkins Point. These boundary disputes were not in themselves the reason for the Compact, which had nothing to do with boundaries as such. But the boundary disputes gave rise to frequent conflict as to jurisdiction over the waters of the Potomac River, the Pocomoke River, and certain parts of Chesapeake Bay, and the rights of citizens of the two states on these waters and adjacent thereto. In addition, Virginia, which had undisputed ownership of the entrance to the Chesapeake Bay, was collecting tolls from all vessels entering the Bay and bound for Maryland ports, and this was one of the main grievances which Maryland desired to correct. It is an interesting fact that the Maryland Commissioners were instructed by the Legislature to make the abolition of these tolls a *sine qua non* to the entering into any compact at all. If this was not agreed to by Virginia, they were told not to go any further in the matter. The history of the circumstances leading up to the Compact will be found in *Scharf's History of Maryland,* Volume II, page 528, etc., and in the opinion of Mr. Justice Field, in the case of *Wharton v. Wise* in the Supreme Court of the United States, 153, U. S., 155, 38 L. Ed. 699. It may be noted that there is one exception to the fact heretofore stated, that the Compact had nothing to do with boundaries. Prior to its execution, the first Virginia Constitution, adopted June 29, 1776, surrendered the claims of

Virginia to the territories contained within her charter, included in the erection of the colonies of Maryland, Pennsylvania, North and South Carolinas, "excepting the free navigation and use of the Rivers Patomaque and Pocomoke with the property of the Virginia shores and strands bounding on either of said rivers and all improvements which have been and shall be made thereon." This claim was not accepted by Maryland, which claimed all the property on the Virginia shores of the Potomac to the high water mark. But in the case of *Maryland v. West Virginia*, 217 U. S. 577, 65 L. Ed. 888, the Supreme Court said that by the Compact of 1785, Maryland assented to the Virginia territorial claims, by the statement in the Compact that the citizens of each state shall have full property on the shores of the Potomac and adjoining their lands, with the privilege of making and carrying out wharves and improvements. In the case of *Morris v. U. S.*, 174 U. S. 196, 43 L. Ed. 946, it had been held that the grant to Lord Baltimore included the Potomac River to high water mark on the Virginia shore. But the Supreme Court in the Maryland v. West Virginia case, *supra*, said that the privileges reserved in the Compact were inconsistent with the former Maryland claim, that the boundary was the high water mark on the south side of the Potomac, and that Maryland, since that time, had never claimed any rights to make grants on that side of the river. To the extent, therefore, of the difference between high water mark and low water mark on the southern shore of the Potomac, the Compact did yield Maryland's claim to territory to Virginia. See also *Washington Airport, etc. v. Smoot, Sand and Gravel Corp.*, Circuit Court of Appeals, 4th Cir., 44 F 2d., 342. But Virginia did not yield up her claim to the rest of the river until the boundary settlement in 1877 hereinafter referred to. In the "Opinion and Award of Arbitrators of the Maryland and Virginia Boundary Line" published in 1877, it is stated that the Commissioners representing Virginia claimed that the true interpretation of the Virginia grants was that the Potomac River should be divided between the states by a

line running in the middle of it. The Maryland Commissioners contended that the whole river was within the limits of the grant to Lord Baltimore. It was not until 1877, therefore, that the Potomac River boundary between the two states was finally settled.

Virginia instituted the meetings which resulted in the Compact by a resolution passed on September 9, 1777, appointing commissioners to meet similar commissioners from Maryland "to consider the most proper means to adjust and confirm the rights of each to the use and navigation of and jurisdiction over the Bay of the Chesapeake and Rivers Potomac and Pocomoke, in order to prevent any difference on these subjects which may interrupt the desirable harmony between the two countries which is equally the interest of both to cultivate." The Maryland Assembly, in the same year, appointed commissioners, and a committee was appointed to draft their instructions. In these instructions is found the direction to make no compact unless Virginia relinquished the tolls she imposed at the capes. The commissioners met, but accomplished nothing. Virginia, on June 28, 1784, again appointed commissioners. Maryland responded, and it was arranged that the Commission should meet in Alexandria, but at the earnest solicitation, it is said, of General Washington, they met at Mount Vernon, on March 28, 1785. The Potomac Company, in which General Washington was very much interested, had just been chartered by Maryland and Virginia. The purpose of this Company was to make the river navigable above tide water, in order to provide a route across the mountains to the Ohio and Mississippi valleys. A number of prominent Marylanders, as well as other Virginians, had stock in it, and it was obviously in the interest of the Company and its stockholders that there should be no dispute about the use of the Potomac between the two states. The Compact was agreed upon at the Mount Vernon meeting, and was signed by George Mason and Alexandria Henderson for Virginia, and Daniel of St. Thomas Jenifer, and Thomas Stone and Samuel Chase, for Maryland, and as we have

already stated, it was ratified by the legislatures of both states. It contained 13 sections. The first disclaims the right of Virginia to impose tolls on vessels sailing through the capes, and trading with Maryland, and agrees that the waters of Chesapeake Bay and the River Pocomoke within the limits of Virginia are forever made a common highway, free for the navigation of Maryland vessels. In the second section, Maryland agrees that Virginia vessels may enter rivers of Maryland without the payment of any duties. The third section provides that vessels of war shall not be subject to payment of port duties. The fourth section is that vessels under certain size belonging to Marylanders or Virginians, in carrying the produce of these states, can trade free and be subject to no port charges. The fifth section states that merchant vessels navigating the Potomac River shall enter and clear at a naval office in one or both of the states, and shall be subject to tonnage in each state only in proportion to the commodities carried to or from such state. The sixth section provides that the Potomac is to be a common highway for navigation and commerce to the citizens of both states and of the United States, and all other persons in amity with the states, trading to or from Virginia or Maryland. The seventh section gives the citizens of each state full property in the shores of the Potomac River adjoining their lands and the privilege of wharves and improvements not obstructing the navigation of the River. The right of fishing in the river, it is stated, shall be common to and equally enjoyed by the citizens of both states; such right, however, not to be exercised by the citizens of one state to the hindrance or disturbance of the fisheries on the shore of the other state, and the citizens of neither state shall have the right to fish with nets or seine on the shores of the other. The eighth section provides that all laws and regulations which may be necessary for the preservation of fish or for the performance of quarantine in the River Potomac, or for the preserving and keeping open the channel and navigation thereof, or of the River Pocomoke, within the limits of Virginia, by preventing

the throwing out ballast or giving any other obstruction thereto, shall be made with the mutual consent and approbation of both states. The ninth section provides that lighthouses, etc., shall be erected on Chesapeake Bay between the sea and the mouths of the rivers Potomac and Pocomoke and upon the rivers Potomac and Pocomoke at the expense of both states. The tenth section, which is the one in which we are chiefly concerned in this case, reads in part as follows: "TENTH, All piracies, crimes or offenses, committed on that part of Chesapeake Bay which lies within the limits of Virginia, or that part of the said bay where the line of division from the south point of Patowmack river (now called Smith's Point) to Watkin's Point, near the mouth of Pocomoke river, may be doubtful, and on that part of the Pocomoke river within the limits of Virginia, or where the line of division between the two states upon the said river is doubtful, by any persons not citizens of the commonwealth of Virginia, against the citizens of Maryland, shall be tried in the court of the State of Maryland which hath legal cognizance of such offences. And all piracies, crimes and offences, committed on the before-mentioned parts of Chesapeake Bay and Pocomoke River, by any persons not citizens of Maryland, against any citizen of Virginia, shall be tried in the court of the commonwealth of Virginia which hath legal cognizance of such offences. All piracies, crimes and offences, committed on the said parts of Chesapeake Bay, and Pocomoke River, by persons not citizens of either state, against persons not citizens of either state, shall be tried in the court of the commonwealth of Virginia having legal cognizance of such offences. And all piracies, crimes and offences committed on the said parts of Chesapeake Bay and Pocomoke River, by any citizen of the commonwealth of Virginia, or of the State of Maryland, either against the other, shall be tried in the court of that state of which the offender is a citizen. The jurisdiction of each state over the river Patowmack shall be exercised in the same manner as is prescribed for the before-mentioned parts of Chesapeake Bay and Poc-

omoke River in every respect, except in the case of piracies, crimes and offences, committed by persons not citizens of either state, upon persons not citizens of either state, in which case the offenders shall be tried by the court of the state to which they shall first be brought; * * *" The remainder of this section has to do with trespass and civil process. The eleventh section provides for libeling all vessels in or upon the Potomac by process from the state in which the vessel entered, and seizure of the vessels and property for any violation of the commercial regulations of either state on the Potomac or Pocomoke Rivers by process from the state whose laws are offended. It also provides for the taking of any person fleeing from justice in a civil or criminal case on any part of the Chesapeake Bay or the rivers by process from each state. The twelfth section allows citizens of one state, owning lands in the other, to transport produce free of tax. The thirteenth section states "these articles shall be read before the legislatures of Virginia and Maryland, and their approbation being obtained, shall be confirmed and ratified by a law of each state, never to be repealed or altered by either without the consent of the other." In Chapter 1 of the Acts of 1785, ratifying the Compact, is the statement "* * * the faith and honor of this state is hereby solemnly pledged and engaged to the General Assembly of the Commonwealth of Virginia, and the government and citizens thereof, that this law shall never be repealed or altered by the legislature of this government, without the consent of the government of Virginia."

Before discussing the Compact further, it may clarify the issue to state the answer of the state to the appellant's contention in this case now before us. The state contends that by what is known as the Black-Jenkins Award, made by arbitrators appointed by Acts of the two states and confirmed by Chapter 274 of the Acts of 1878, of the General Assembly of Maryland, and by Chapter 246 of the Acts of 1877-1878, of the General Assembly of Virginia, and consented to by Act of Congress of March 3, 1879, Chapter 196, 20 statutes at large, 481, the boundary be-

tween Maryland and Virginia was definitely fixed at the low water mark on the southern shore of the Potomac River, with a straight line drawn between headlands. That by this award the reason for any jurisdiction by Virginia over the Potomac River, as provided in the tenth section of the Compact, ceased, and that section thereupon ceased to be operative on the River for the punishment of such crimes as the one before us. That this has been recognized by both states by the legislation passed. That they passed concurrent acts relating to fishing in the Potomac River, but not as to any other offenses. That Virginia has passed no acts providing for the prosecution of the offenses set out in the tenth article of the Compact. That Maryland immediately passed Chapter 485 of the Acts of 1880, heretofore referred to as Section 631 of Article 27, relating to offenses on steamboats, and by Chapter 487 of the Acts of 1908, now codified as Section 161 of Article 75 of the Code, the Maryland legislature provided that the jurisdiction of every county, bounded at any point by navigable waters, should extend from the shore to the inside of the channel, "except where such waters adjoin neighboring states, in which case the jurisdiction of said counties shall continue to the ultimate limits of the state at the place in question." That this last clause refers to the Potomac.

In 1829, in a case involving alleged damage by the Chesapeake and Ohio Canal Co., successor to the Potomac Company, to certain land of the plaintiff along the Potomac, located partly in the District of Columbia and partly in Maryland, Chancellor Bland, in a lengthy opinion, took occasion to discuss the scope and object of the Compact of 1785. The question before him was whether the Compact applied to the Potomac River above tidewater. He determined that it did not, and in the course of his discussion said of the tenth section. "The tenth establishes certain regulations respecting piracies, crimes, and offenses, and for any violence, injury, or trespass, to or upon the property, or lands of the other adjacent to the said bay or river, etc. Piracy is a name given to no of-

fense committed within the body of a county; but only to crimes upon bays and rivers, or any tide-water, considered as an arm of the sea, not within the body of a county; but originally and properly within the jurisdiction of the admiralty. This provision respecting piracy, therefore, clearly confines the whole article to acts done on tidewater, or abroad, and not within the body of any county, and of which the courts of common law could not otherwise have jurisdiction." Binney's Case 2, Bland 99 at page 126. Chancellor Bland's discussion of the Compact, including the above quotation, was cited by this court in the case of *Middlekauff v. LeCompte*, 149 Md. 621, 132 A. 48. In the last case the court, speaking through Chief Judge Bond, also discussed the Compact, and decided that the eighth section, which provided for the making of concurrent laws and regulations for the preservation of fish in the Potomac, had no application to fishing in the upper unnavigable portion of the river. It may be noted, in connection with the statement that the common law had no jurisdiction over tidewater not within the body of any county, that since the adoption of the Federal Constitution, the Congress has confined the Federal jurisdiction over crimes committed on water to such as are committed "out of the jurisdiction of any particular state." See *Ex parte Ballinger*, D. C. 88, Fed. 781; *United States v. Bevans*, 16 U. S. 336, 4 L. Ed. 404 (opinion by Chief Justice Marshall) ; *St. Clair v. United States*, 154 U. S. 134, 38 L. Ed. 936.

In 1856, it was held that under the eighth article of the Compact no act of the General Assembly of Maryland could have any operation in the Potomac River, affecting the fishing therein, unless such act had been assented to by the State of Virginia. *State v. Hoofman*, 9 Md. 21. In 1885, Governor Lloyd asked I. Nevitt Steele, a distinguished member of the Maryland Bar, for an opinion on the status of the Compact. He received from Mr. Steele, a thorough and comprehensive discussion of the Compact, and of the various acts of assembly passed up to that time. The question he was asked was whether, after the lapse of

a century, and after the concurrent legislation passed with respect to fishing, the Compact had been superseded by the Constitution of the United States. Mr. Steele held that it was in full force and effect. He notes that the Compact has been upheld in *Binney's Case, supra,* and in *State v. Hoofman, supra,* and also by Virginia in the case of *Hendricks v. Commonwealth,* 75 Va. 934, and by the Supreme Court of the United States in the case of *Georgetown v. the Alexandria Canal Co.,* 12 Peters 91, 9 L. Ed. 1012, and *Potomac Steamboat Co. v. Upper Steamboat Company,* 109 U. S. 672, 27 L. Ed. 1070. He also cites the fact that the Maryland Act of 1878, Chap. 274, by which the Black-Jenkins Boundary Award was accepted, contains the proviso that neither of the states nor the citizens thereof should thereby "be deprived of any of the rights and privileges enumerated and set forth in the Compact between them, entered into in the year 1785, but that the same shall remain to and be enjoyed by the said states and the citizens thereof forever." Mr. Steele then passes to the question upon which he states he understands the opinion is desired, namely, the right of oyster fishery by the states and their respective citizens in the waters of the Potomac River and of Pocomoke Sound and the Pocomoke River. He held that there was no right of fishery given by the Compact in Pocomoke Sound, and Pocomoke River, within the limits of Virginia, and therefore the exclusive right of fishery there belonged to the citizens of Virginia, but the opposite was the case with respect to the Potomac River. This is a construction different from that suggested in the case of *Hendricks v. Commonwealth, supra,* where the Virginia court was concerned with the right of fishing in the Potomac, but in the course of its opinion said that this right also existed in the Pocomoke. Mr. Steele disagreed with this and it is interesting to find that his entire opinion and his conclusion on this point was sustained with reference to the Pocomoke River, by the Supreme Court in the case of *Wharton v. Wise,* 153 U. S. 155, 38 L. Ed. 669, already referred to.

In the case of *Biscoe v. State,* 68 Md. 294, 12 A. 25, 26, decided in 1888, the plaintiff in error was indicted in the Circuit Court for St. Mary's County, for the murder of a citizen of Maryland, alleged to have been committed on the Potomac River of that County. The main question considered on appeal was whether the Circuit Court of that county had jurisdiction over the offense. The court, speaking through Judge Robinson, said that since the boundary of St. Mary's county had been defined by the Act of 1695, Chap. 13, the courts of that county had, for a period of nearly 200 years, exercised jurisdiction over offenses committed on the river. The court, however, said that it would not rest the decision in favor of jurisdiction on the ground of continuous exercise. The Potomac River belonged to Maryland by the charter granted to Lord Baltimore, and over it the state had always exercised jurisdiction, except so far as that jurisdiction was restricted by the Compact of 1785. The Circuit Courts of the several counties lying on the Potomac River exercised a common law jurisdiction over offenses committed on the river opposite their shores, and, as far back as 1773, concurrent jurisdiction with the Provincial Court over all crimes and offenses was conferred on the county courts. And in 1801 the concurrent jurisdiction of the General Court over criminal cases was taken away, and from that time to the date of the decision, the county court and the Circuit Courts, as successors, had exercised exclusive concurrent jurisdiction. The court then said "And the Potomac River being part of the state, and subject therefore to its jurisdiction, the Circuit Courts of the several counties bordering on said river, as common law courts, exercise criminal jurisdiction over offenses committed on said river opposite such counties. And the exercise of this jurisdiction was recognized by the Legislature in ratifying the compact made with the State of Virginia, for although jurisdiction was in a certain class of offenses conceded to that state, yet it provided that offenses committed by citizens of Maryland against its own citizens, should be tried by the courts of this state having

jurisdiction over such offenses. And it is well known that the County Courts of the several counties lying on the Potomac, at that time exercised a common law jurisdiction over offenses committed on its waters opposite such counties. We have then by the Act of 1785. Chap. 1, a recognition of the jurisdiction of these counties over offenses committed on the Potomac River, if any such recognition be needed."

In 1893, three citizens of Maryland, Marsh, Wharton and Nelson, were convicted and imprisoned by the County Court of Accomack, Virginia, for offenses against the fishery laws. Marsh was convicted for violating a section of the Virginia Code which forbade catching oysters with an instrument other than oyster tongs in any of the waters of the commonwealth. The indictment in his case charged that the offense was committed on Hurley's Rock in Tangier Sound within the limits of Virginia. Wharton and Nelson were convicted of not paying tax and obtaining a license for catching oysters in Virginia waters, they not being residents of Virginia. Their offense was committed in Pocomoke Sound. After conviction, the parties applied to the United States District Court for the Eastern District of Virginia for a writ of *habeas corpus*. The petitioners were represented by the Attorney General of Maryland, as well as two private counsel, and the state of Virginia was represented by its Attorney General. The lower court considered the two sets of cases separately, and as an appeal was taken in the Wharton case to the Supreme Court, and there decided, we will not discuss what the lower court said about that case. Marsh's case, however, was different, in that it was committed at a place near the boundary line between Virginia and Maryland, running from Smith's Point to Watkin's Point, where the line was doubtful. It was therefore claimed that under the Compact of 1785, Virginia had no jurisdiction to try him. The court said that the Black-Jenkins Award, accepted by both states and by Congress, clearly defined the lines between the two states, east of Watkin's Point. The court further said that the Marsh defense was

that since the boundary was doubtful, the prisoner was entitled to the privilege granted by the tenth section of the Compact of 1785, which would permit him to be tried in the Maryland Court, but that, although as a matter of historical fact, no part of the line between Maryland and Virginia was, at the date of the Compact of 1785 more doubtful than the point between Smith's Point and Watkin's Point, nevertheless, it had, by the Black-Jenkins Award been clearly, precisely and minutely defined. "The line is no longer doubtful, and the defense of the prisoner Marsh is inadmissible. It was competent for the Virginia Court by which he was convicted to try him, and he must be remanded to the custody of the sheriff of Accomack County, Virginia." *Ex parte Marsh* 57, 719, at page 731. It will be seen that in reference to an offense against the fishing laws, the court did not make any difference between these and the criminal laws in respect to the tenth section, but held that inasmuch as the tenth section referred to a part of the Bay from Smith's Point to Watkin's Point, where the line of division might be doubtful, it ceased to be operative as soon as the line was established and ceased to be doubtful. That is the state's contention in the case before us.

Wharton's case was appealed to the Supreme Court, and was considered by that court in the case of Wharton v. Wise, already referred to. While the Compact of 1785 was upheld, the case before the court was concerned with Pocomoke Sound in which the Supreme Court found there was no right of fishery given to the citizens of Maryland. This conclusion was directly contrary to that of the Virginia court in *Hendricks v. Commonwealth, supra.* The only statement in the Wharton case which has any bearing on the question before us, is a reference to the tenth section. That, according to the court, did not apply to catching and taking oysters, because it was concerned only with offenses committed upon citizens of Virginia, whereas the taking of oysters was an offense against the State of Virginia, because oysters were the property of the state.

While this court in the Biscoe case, *supra,* did not rest its decision upon the long continued exercise of jurisdiction by the courts of Maryland over the Potomac River, it noted that question, and said that if the objection to the jurisdiction was well founded, "it seems strange, to say the least, that it should, during all this time, have escaped the attention of all the lawyers and judges of both the provincial and state governments." In this connection it is pertinent to note a recent decision of the Virginia Court of Appeals in a bigamy case as to the jurisdiction of the Virginia courts in criminal cases. "The venue is the element of territorial jurisdiction as in all criminal cases. Every crime to be punished in Virginia must be committed in Virginia. So murder, rape, or robbery must be committed within the confines of this State to give jurisdiction to its courts." *Farewell v. Commonwealth* (1937) 167 Va. 475, 189 S. E. 321 at p. 323.

The long dispute about boundaries between Maryland and Virginia, and the general effect of the Compact of 1785, was considered by the Supreme Court in two cases between Maryland and West Virginia, neither of which, however, has any special bearing on the point before us. These are *Maryland v. West Virginia,* 217 U. S. 577, 54 L. Ed. 645 and *Maryland v. West Virginia,* 54 L. Ed. 888. In the last case it was held that low water mark on the south bank of the Potomac on the West Virginia shore, was the true southern boundary line of the State of Maryland. In 1930, the Circuit Court of Appeals for the Fourth Circuit, had before it a suit to enjoin trespasses on land between high and low water mark on the Virginia side of the Potomac River opposite the District of Columbia. In that case there was a discussion of the boundary line as established by the Compact and the subsequent Black-Jenkins arbitration, and the conveyances of land from Virginia to the District of Columbia, and back again. The case, which is *Washington Airport v. Smoot Sand and Gravel Corp.,* 44 F 2d 342, 344, has no bearing upon the point at issue, but is mentioned because of a statement of Judge Parker, who wrote the opinion, holding that the

Compact did not intend to give Maryland jurisdiction over the parts of the Potomac River shore which belonged to Virginia. The theory of the court, which was the same as that in *ex parte Marsh, supra,* is that concurrent jurisdiction was intended only in doubtful areas. The statement referred to is "It would have been absurd to have confirmed the right of property in the Virginia shores to the citizens of Virginia and at the same time to have reserved to the state of Maryland political jurisdiction over those shores, so that controveries over titles thereto would be justiciable only in Maryland and crimes committed thereon punished only in Maryland courts."

Turning to the tenth section of the Compact itself we find three territorial divisions over which partial jurisdiction is given to Virginia. The first is "that part of Chesapeake Bay which lies within the limits of Virginia, or that part of the said Bay where the line of division from the south point of Potowmack River, (now called Smith's Point) to Watkin's Point, near the mouth of Pocomoke River may be doubtful." The second is on "that part of Pocomoke River within the limits of Virginia, or where the line of division between the two states upon the said river is doubtful." The third, is "over the River Potowmack," which while not stated in the Compact to be claimed by both states, had been, since the earliest settlement of the two provinces, a subject of territorial and jurisdictional dispute. Concurrent jurisdiction is not yielded over any waters admitted to belong to Maryland by the tenth section.

At the time of the making of the Compact, Maryland was without free access to the ocean for her commerce, all of which then was water-borne. How important this was, is shown by the instructions given to the Commissioners to the first conference to agree to nothing unless Virginia gave up her right to exact tolls at the mouth of the Chesapeake. On the other hand, each state apparently levied port duties and charges against vessels of the other entering her harbors. This was a source of vexation and expense. Added to these questions was the

underlying fact of disputed jurisdiction over the waters on which much of the commerce between the two states was carried on. This was because of the boundary lines which were not agreed upon. The Compact was a compromise, intended to cover existing conditions, which so far as those in authority in the two states could then see, might continue indefinitely. The adoption of the Constitution of the United States, could not then be foreseen. When that occurred, Maryland's chief complaint, that against the tolls at the Capes, was remedied, and would have been remedied, irrespective of the earlier agreement .with Virginia in the Compact. But Virginia's rights to free fishing and the jurisdiction given her courts over offenses committed by and against her citizens were not affected by the Constitution. They remained to cause difficulties between the states for many years, and the fishing laws are still a source of much annoyance and have resulted in the passage of many concurrent laws. The boundary disputes also gave rise to much discussion and litigation until they were finally settled by the Black-Jenkins award. When that was done, the reason for Virginia's having any criminal jurisdiction over the Potomac vanished, and with it went, by every intendment of common sense and legal reasoning, the jurisdiction itself.

The situation, with respect to the tenth section, is essentially different from that arising out of the seventh and eighth sections. The rights under these last two sections had to be implemented by concurrent acts of the legislatures of the two states, and such acts have been passed from time to time. See "Potomac River Statutes," Virginia Code of 1942, Chap. 129, Sections 3299 and 3305, Code of Public General Laws of Maryland, 1939, Article 39, Sections 65-74 and Article 72, Sections 64-73. But the tenth section did not require any acts to authorize either state to exercise jurisdiction over the disputed areas.. Each claimed that such areas were within its territorial boundaries. When, however, the boundary dispute was settled, then it became necessary for Vir-

ginia to enact legislation, if the tenth section were still in effect, giving her courts extra-territorial jurisdiction. When the Virginia courts were reorganized in 1776-7 the body of its original jurisdiction fell to the General Court which was organized by an act of which Thomas Jefferson was said to be the author. (9 *Hennings Statutes* 401.) By the Act of 1779, Chap. 26 (10 *Hennings Statutes* 98) the Court of Admiralty of Virginia was established which was given jurisdiction over all maritime cases "except those wherein any parties may be accused of capital offenses." In 1786, the Virginia Legislature passed a law, re-enacted in 1792, authorizing the General Court to try offenses against the Commonwealth, committed by any citizens thereof "in any place out of the jurisdiction of the Courts of common law in this Commonwealth, and all felonies committed by citizens against citizens in such place other than the high seas." In 1819, this Act, which gave the General Court jurisdiction to try cases which might occur on the Potomac River, was repealed. In the same year, however, and before the repeal became effective, the case of *Comomnwealth v. Gaines,* 2 Va. Cas. 172, was decided. The majority of the Court held that the General Court had the power *before* the passage of the Act of 1786, to try capital offenses excluded from the Admiralty Court, occurring on the Chesapeake Bay, and such of its rivers, havens and creeks as were out of the jurisdiction of the Courts of common law. A strong minority, however, held that the Act of 1786 was passed to provide a tribunal to try cases occurring under the Compact of 1785, and that the General Court had no such jurisdiction before the Act of 1786. In the case of *Strouther v. Commonwealth,* 92 Va. 789, 22 S. E. 852, decided in 1895, the Court, by implication, adopted the minority's view in *Commonwealth v. Gaines.* It referred to that case, and said that it turned on the construction of a statute "which disappeared from our laws in 1819 and it may be fairly presumed was repealed because the Legislature preferred that the rule in Virginia should continue at common law." According to this view, how-

ever, after 1819 there was no power in any Virginia Court to try any case arising outside of her boundaries, but until the Black-Jenkins Award her courts still claimed jurisdiction over the Potomac River because it was still claimed to be within the boundaries of Virginia. The Strouther case was a prosecution for larceny of a horse, occurring in Berkeley, West Virginia. The stolen horse was brought to Winchester and the Winchester Court indicted. The Court held that there was no statute in the state authorizing such a prosecution, and no decision of the Court, therefore, turned to the common law and decided that the Winchester Court was without jurisdiction. The same conclusion was reached in *Anderson v. Commonwealth*, 100 Va. 860, 42 S. E. 865, and in the recent case of *Farrell v. Commonwealth*, 167 Va. 495, 189 S. E. 321, decided in 1937, heretofore referred to and quoted from. Criminal jurisdiction in Virginia is vested in the circuit courts. Virginia Code, 1942, Title 59, Sec. 5890. The circuit courts were the successors of the old district courts established in 1788, and superseded by the circuit courts in 1808. By the Constitution of 1830 and the Acts of Assembly of 1831, the older General Court came to an end and the third General Court was established, the first having been during provincial days. By the Act of May 21, 1852 (Acts of 1852, p. 62), this last General Court was abolished and its original jurisdiction given to *nisi prius* courts. (See Francis H. McGuire on The General Court, Vol. 8, Va. State Bar Association Reports, 1895, page 197, and R. G. H. Kean on Virginia Judicial System, Vol. 2, Virginia State Bar Association, Reports, 1889, at page 139.) Under the statutes and decisions of Virginia, therefore, there is no longer any court with jurisdiction to try offenses other than those under concurrent fishing acts, committed on the Potomac River.

The Maryland situation is entirely different. Her courts have always claimed jurisdiction over the Potomac as part of her territory, and when the Black-Jenkins Award was confirmed, her right to this jurisdiction was established beyond question. After that time Virginia

would have had to provide by legislation for courts which, in the words of the tenth section of the Compact, could take "legal cognizance" of offenses committed outside of her boundaries. Maryland had to provide no such legislation because the Potomac was within her boundaries and came within the jurisdiction of her courts. The Act of 1880, Chap. 485, enlarged the jurisdiction of the courts in the counties to offenses occurring on steamboats, by giving jurisdiction over offenders on such boats to any county, from, to or through which the boat might run. In the case of *Biscoe v. State, supra,* already discussed, it was shown that the courts of one of the Southern Maryland counties had, ever since the earliest days of the province, exercised jurisdiction over offenses committed on the river. By the Act of 1908, Chap. 487, is emphasized the fact that the jurisdiction of the Southern Maryland counties extends to the ultimate limits of the state across the Potomac River, which would be to low water mark on the Virginia shore. In all other cases where navigable waters divide counties, the jurisdiction of the bordering counties extend to the center of the channel, but the exception clearly refers to the Southern Maryland counties, because they are the only ones which border on navigable waters where a neighboring state is on the other side. The exception, therefore, was necessary because had the Act passed without it, their jurisdiction would have been restricted. The Act did not give any additional jurisdiction, but merely confirmed the jurisdiction heretofore exercised.

It is not necessary for the purposes of this opinion to determine just which *courts* of the two states in 1785 claimed jurisdiction over the several waters mentioned in the tenth section of the Compact. Maryland had an Admiralty Court from Provincial days. It was organized as a separate court in 1684, and its proceedings can be found in the records of the Provincial Court. The same judges, or some of them, sat as both courts. See XLIX Archives of Maryland and Letter of Transmittal by the Publication Committee of the Maryland Historical So-

ciety, p. XV. When the first State Constitution of 1776 was adopted, provision was made in it for an Admiralty Court, but this was changed by the amendment of 1804. When the United States Constitution was adopted, the Maryland Admiralty Court was in existence, and continued to claim jurisdiction over certain matters. See *Nicholson v. State,* 3 Har. & McH. 109. It seems probable from these facts, and from the statement of Chancellor Bland, in *Binney's Case,* 2 Bl. p. 99, at p. 126, *supra,* that the Admiralty Court and not the County Courts or the General Court exercised jurisdiction in 1785 over waters not within the limits of any county. The statement of Judge Robinson in *Biscoe v. State,* 68 Md. 294, 12 A. 25, refers only to the Potomac River, which was within county limits.

In Virginia that had been an Admiralty Court since 1619 (3 *Hen. Stat.* p. 176) with jurisdiction to try crimes "in any river, haven, creek or bay where the admirall hath jurisdiction." In 1779, as we have already shown, capital offenses were excluded from the Admiralty Court's jurisdiction. The Virginia Court held that the General Court had jurisdiction to try cases occurring on waters and not within the Admiralty Courts' jurisdiction. (*Commonwealth v. Gaines,* 2 Va. Cas. 172, *supra.*) This is stated in both majority and minority opinions, although on different grounds. The result seems to be that in 1785, the Admiralty Court of Virginia was the Court in that State with jurisdiction to try cases (except capital offenses) occurring in waters which were not within the territorial jurisdiction of any county. Capital offenses and other cases in waters within the limits of counties were under the jurisdiction of the General Court.

The grant of judicial power in the United States Constitution over all cases of admiralty and maritime jurisdiction includes criminal as well as civil cases. *Benedict, Admiralty,* 5th Ed., paragraph 579. Congress has power to legislate as to crimes committed upon inland waters. *U. S. v. Flores,* 289 U. S. 137, 77 L. Ed. 1086, and cases

cited. If it were not for the limitation by the Act of Congress, the crime of rape could be punished under paragraph 457, U. S. C. A., Title 18.

It follows that so far as Section 10 of the Compact dealt with extra-territorial rights predicated upon an admiralty jurisdiction over navigable waters, that jurisdiction ceased to exist with the adoption of the Constitution of the United States. What remained was the common law jurisdiction, based on a territorial concept. We find no intention on the part of either State in the tenth section to barter away permanently such jurisdiction, and need not inquire into the power of either to do so. The legislatures and courts of both states, as we have shown, have construed it to mean that as soon as the boundary of Maryland was established at low water mark on the Virginia shore, the Virginia jurisdiction over offenses on the Potomac River ceased by operation of law, and complete jurisdiction remained in the Maryland courts because the river was determined to be within her territorial limits. Such a construction by both States is compelling and should be followed, unless we find it erroneous.

On the contrary, it seems to be logical and sensible that when the obvious reason for the agreement has been done away with by the parties, that part of the agreement affected falls with the subsequent change in the circumstances. And if Maryland courts cannot try such offenders as the appellant for acts committed within her boundaries, and if Virginia Courts have no such authority, then the Potomac River becomes a highway for crime, a waterway within the State of Maryland where the criminals of Virginia, or those from elsewhere who commit offenses against the citizens of Virginia, can operate with immunity from punishment, and with complete freedom from all fear of consequences. Such a condition is unthinkable, and no court would be justified in holding it exists. Such a decision would not administer justice. It would thwart and obstruct justice.

Our conclusion is that Maryland has jurisdiction, properly exercised in the instant case through the Circuit Court for Prince George's County. The judgment will therefore be affirmed without costs, under the provisions of the Act of 1945, Chapter 1068.

*Judgment affirmed, without costs.*