Edward M. BOSTICK, Henry I. Altshuler, Anna B. Wickes and Virginia R. McDonnell, Mrs. Norma J. Bostick and Mrs. Roselina R. Altshuler,

v.

**SMOOT SAND AND GRAVEL CORPORATION.**

Civ. No. 8974.

United States District Court
D. Maryland.

Aug. 21, 1957.

Niles, Barton, Yost & Dankmeyer, Baltimore, Md. (Carlyle Barton, Theodore R. Dankmeyer and Robert C. Prem, Baltimore, Md.), for plaintiffs.

Piper & Marbury, Baltimore, Md. (Charles C. G. Evans and E. Clinton Bamberger, Jr., Baltimore, Md.), for defendant.

R. DORSEY WATKINS, District Judge.

This is an action by the owners and occupants of four contiguous parcels of land adjacent to Mt. Vernon, Fairfax County, Virginia, against the defendant, a Delaware corporation qualified to do business in Maryland. The complaint, in four counts, alleges a cause of action in trespass againt the defendant; a claim for nuisance in the manner in which said trespass has been and is being committed; and a claim for damages for the taking and carrying away of the "exclusive property" of plaintiffs.[1]

More specifically, the complaint alleges that defendant is dredging sand, gravel and other materials from "the bed of the Potomac River in Charles County, State of Maryland" between the near channel line and the highwater line of the Potomac River on the Virginia side, approximately seven hundred and five yards off shore from plaintiffs' property, such dredging being in Charles County, Maryland, without license or permit from plaintiffs; "that said dredging constitutes a trespass[2] upon the riparian rights" of the plaintiffs "in the bed of the Potomac River as granted to them" by Article 27, Section 572 of the Annotated Code of Maryland, 1951 Edition, in that plaintiffs "as owners in fee simple of riparian lands bordering on the Potomac River * * * are the owners of exclusive riparian rights in the bed of said river opposite said lands from highwater mark on the shore bordering said lands to the outer line of the channel nearest said shore, granted to them by enactment of the Legislature of the State of Maryland codified as Article 27, Section 572 of the Annotated Code of Maryland, 1951 Edition, as follows:

"572. It shall not be lawful for any person to dig, dredge, take and carry away any sand, gravel or other material from the bed of any of the navigable rivers, creeks or branches of this State, under a penalty of a fine not exceeding Three Hundred Dollars ($300), and confiscation of the boat, vessel, dredge and implements used in digging, dredging and

---

1. The fourth count claims that defendant, by removing sand and gravel from in front of the plaintiff Wickes' property, has caused a sliding or subsidence of twenty feet of the shore line of her property. Plaintiffs and defendant have agreed that the case should be tried on the first three counts, all evidence and proceedings with respect to the fourth count to be held in abeyance, with the same force and effect as if a separate suit had been filed solely on said fourth count.

2. In the course of the litigation, and in view of the language used by United States District Judge Bryan in United States of America v. 640.61 Acres of Land, More or Less, Situate in Prince William County, Virginia, and Barclay H. Davis, et al., in the United States District Court for the Eastern District of Virginia, Misc. No. 689, Parcel 2, plaintiffs variously referred to their interests as a "profit a prendre" or a "right" (A.L.I. Restatement of Property, Sections 450, 489). Whatever, if any, may be the significance of the nomenclature as to any statute of limitations, or measure of damages, the parties in this phase of the case have (properly) concentrated upon the fundamental question of whether or not any right of plaintiffs, however characterized or described, has been violated by defendant. See R.F.Civ.P. 1, 8 (a), 28 U.S.C.A.

carrying away such sand, gravel or other material, and imprisonment in the county jail for a period not exceeding six months, in the discretion of the court; one-half of said fine and one-half of the proceeds of the sale of such confiscated boat, vessel, dredge and implements, to be paid by the sheriff to the informer, and the other half to the commissioners of public schools for the counties, *provided, however, that it shall be lawful for any riparian owner of lands bordering on said rivers, creeks or branches, or for any person or corporation with whom such owner shall have a contract in writing for the purpose, or for the agents, servants or employees of such person or corporation to dig, dredge, take and carry away such sand, gravel, or other material from the bed of said river opposite said lands from highwater mark on the shore bordering on said lands to the outer line of the channel nearest said shore,* subject to the laws of the United States relating to navigation; and provided further, that none of the provisions of this section shall be deemed to interfere in any manner with the provisions of any law of the State relating to the taking and catching of fish and oysters." (The italicized portions were added in 1900 and 1906, and are further discussed below).

The complaint further alleges that such dredging operations are carried on "in a noisy, unpleasant, unhealthful, unsanitary manner in such a way as to constitute a nuisance to the Complainants and otherwise interfere with the quiet enjoyment of the properties of the Complainants."

Such taking and carrying away of gravel and other material "which are the exclusive property" of plaintiffs is averred to have been done without license or permit.

The complaint prays for an injunction against the taking of gravel and other material from the *"highwater* mark" on the Virginia shore of plaintiffs' properties to the outer line of the channel of the Potomac nearest said shore; for an accounting for the value of the gravel and other materials removed from such areas; and for costs and other relief.

Defendant answered, denying the allegations of nuisance; denying that plaintiffs had any rights beyond low water mark, under Maryland Code, Article 27, Section 572 or otherwise; and averring that the title to land under water from the low water mark on the Virginia shore to the outer line of the channel of the Potomac nearest the Virginia shore was vested in the State of Maryland, and that by action of the Maryland Board of Public Works, defendant was vested with authority to remove sand and gravel between low water mark on the Virginia side and the outer line of said channel.

The case so made by the pleadings presented the narrow, if not easy, question of the interpretation of the provisions of Maryland Code, Article 27, Section 572. However, at final argument, plaintiffs presented the additional proposition that, in the alternative,[3] their rights were based upon the Compact of 1785 between Maryland and Virginia, and the Black-Jenkins [Boundary] Award of 1877; or upon said Compact and Award as implemented by "statutes of the State of Maryland and/or the Commonwealth of Virginia."

The issues so tendered require a more extended excursion, although into a most interesting field, than those specifically advanced in the Complaint.

*The Compact of 1785 between Maryland and Virginia.*

3. As summarized, plaintiffs in their complaint and in their main brief, asserted that they were claiming upon rights "granted" by Maryland Code, Article 27, Section 572. At the final argument, they contended that said Section, as original-

ly enacted, was in violation of the Compact between Maryland and Virginia of 1785, and that their "rights" really stemmed from that Compact and the Black-Jenkins Award (boundary settlement) of 1877.

The boundary between Maryland and Virginia has now been established as the low water line [4] on the Virginia shore of the Potomac River.[5] However, the controversy preceding this determination, and particularly certain provisions of the Compact of 1785, are relied upon by plaintiffs in support of their position.

Historically, the State of Maryland and the Commonwealth of Virginia have both laid claim to the entire Potomac. These conflicting claims stem from conflicting grants made by successive kings of England in the Seventeenth Century. In May, 1609, James I granted to the Commonwealth of Virginia a tract of land extending two hundred miles northward from Point Comfort. This embraced all of the Potomac River and much territory beyond. In 1632 Charles I made a grant to Lord Baltimore including substantially what is now the State of Maryland, the southern boundary of which was described in part as to the farther bank of said river and following it. In 1688 James II granted to Lord Culpepper what is now known as the northern neck of Virginia including the Potomac River and all the islands within the outermost banks thereof.

These conflicting grants led to considerable controversy between the two states both before and immediately after the Revolution. The chief problem which concerned the State of Maryland was the practice of the Commonwealth of Virginia to levy tolls upon vessels proceeding to Maryland through the Virginia waters of the Chesapeake. Conferees on behalf of Maryland, appointed to confer with similar representatives of Virginia, had explicit instructions to break off the conferences unless the representatives of Virginia would agree to forego this practice. Following one or more unsuccessful endeavors to settle the matter, on March 28, 1785 a compact was entered into between the commissioners of the two states. This compact was approved by the Legislature of the State of Maryland by Chapter 1 of the Acts of 1785. The Virginia Legislature approved the compact by Chapter 17 of its Acts of 1785. The Maryland act provided specifically:

"* * * every article, clause, matter and thing, in the same Compact contained, shall be obligatory on this State and the citizens thereof, and shall be forever faithfully and inviolably observed and kept by this government, and all its citizens, according to the true intent and meaning of the said Compact; and the faith and honor of this State is hereby solemnly pledged and engaged to the General Assembly of the Commonwealth of Virginia, and the government and citizens thereof, that the law shall never be repealed

4. State of Maryland v. State of West Virginia, 1910, 217 U.S. 577, 581, 30 S.Ct. 630, 54 L.Ed. 888; Washington Airport v. Smoot Sand Co., 4 Cir., 1930, 44 F.2d 342, reversed on other grounds, 1931, 283 U.S. 348, 51 S.Ct. 474, 75 L.Ed. 1109; 9 Ann.Code of Va. (1950 Ed.) Sec. 62–2; Miller v. Commonwealth, 1932, 159 Va. 924, 166 S.E. 557; Barnes v. State of Maryland, 1946, 186 Md. 287, 47 A.2d 50, certiorari denied, 1946, 329 U.S. 754, 67 S.Ct. 95, 91 L.Ed. 650. This, however, as developed in the Black-Jenkins Award of 1877, and the Mathews-Nelson Survey of 1927, was definitely an oversimplification. The bearing of the Survey upon the questions in this case will later be developed.

5. The history of the boundary disputes may be found in Wharton v. Wise, 1894, 153 U.S. 155, 14 S.Ct. 783, 38 L.Ed. 669; Morris v. United States, 1899, 174 U.S. 196, 19 S.Ct. 649, 43 L.Ed. 946; State of Maryland v. State of West Virginia, 1910, 217 U.S. 1, 30 S.Ct. 268, 54 L.Ed. 645; State of Maryland v. State of West Virginia, 1910, 217 U.S. 577, 30 S.Ct. 630, 54 L.Ed. 888; Barnes v. State, 1946, 186 Md. 287, 47 A.2d 50, certiorari denied 1946, 329 U.S. 754, 67 S.Ct. 95, 91 L. Ed. 650; Scharf's History of Maryland, Volume II (1879); The Compact of 1785, Research Report No. 26 of the Legislative Council of Maryland, Carl N. Everstine (1946); Report on the Location of the Boundary Line Along the Potomac River Between Maryland and Virginia, Edward B. Mathews and Wilbur A. Nelson (1928).

or altered, by the Legislature of this government, without the consent of the government of Virginia."

Section 7 of the Compact, in particular, reading as follows, is urged by plaintiffs:

"Seventh, The citizens of each state respectively shall have full property in the shores of Patowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharfs and other improvements, so as not to obstruct or injure the navigation of the river, but the right of fishing in the river shall be common to, and equally enjoyed by, the citizens of both states; provided, that such common right be not exercised by the citizens of the one state to the hinderance or disturbance of the fisheries on the shores of the other state, and that the citizens of neither state shall have a right to fish with nets or seans on the shores of the other." (Original orthography preserved).

It is conceded by both plaintiffs and defendant that at the time of the Compact, "the emoluments and advantages" belonging to the ownership of property on the shores of navigable waters (riparian rights) encompassed in Maryland only the right to acquire any increase in the fast land by alluvion or the natural recession of the water. It did not include even the right of wharfage; the right to erect improvements into the navigable water in front of the fast land. Goodsell v. Lawson, 1875, 42 Md. 348, 362. In Virginia, the riparian owner had these rights and also had the right to build a wharf or pier, but he did not own the bed of the river, or have any right to remove sand, gravel or other materials therefrom. Grinels v. Daniel, 1910, 110 Va. 874, 67 S.E. 534; 2 Virginia L.Rev. 436 (1915).

The Compact preserved as to riparian owners in Virginia, and conferred upon riparian owners along the Potomac in Maryland, "the privilege of making and carrying out wharfs and other improvements, so as not to obstruct or injure the navigation of the river * * *" [6]

Thus the Compact did not confer upon owners of land abutting the Potomac River in Virginia any rights, title or interest in or to the bed of the river which they did not have in 1785; nor upon Maryland riparian owners any except the right of wharfage. At that time landowners in Maryland and Virginia did not have the right themselves to remove sand, gravel or other materials from the bed of the Potomac River; or to prohibit the removal by others.

The plaintiffs' right to make improvements into the Potomac in front of their properties does not give them any antecedent title to the bed of the River. They may complain of violation of their common law rights, or the wharfage right under the Compact, only if, as, and when they seek to erect improvements, the then acts of another interfere with the making of such improvements. Hodson v. Nelson, 1914, 122 Md. 330, 337–342, 89 A. 934; Culley v. Hollis, 1942, 180 Md. 372, 25 A.2d 196.

Through the years following the adoption of the Compact the two states continued to debate the exact location of the boundary line between the two states, and in the year 1877 independent arbitrators appointed by both states met at Alexandria and adopted what is known as the Black-Jenkins Award of 1877. This award attempted to make it clear that the boundary line between the two states should be located at the low water mark on the Virginia side of the Potomac River. The boundary along the Potomac was described as follows:

"Beginning at a point on the Potomac River where the line between Virginia and West Virginia strikes

---

6. The owners of land along navigable water in Maryland other than the Potomac River, did not have the right of wharfage until 1862. Annotated Code of Maryland (1951 Edition) Article 54, Section 46.

the said river at low-water mark, and thence following the meanderings of said river by the *low-water mark* to Smith's Point at or near the mouth of the Potomac * * * The low-water mark on the Potomac to which Virginia has a right in the soil, is to be measured * * * from low-water mark at one headland to low-water mark at another, without following indentations, bays, creeks, inlets or affluent rivers.

"Virginia is entitled not only to full dominion over the soil *to low water mark* on the south shore of the Potomac River, but has a right to such use of the river beyond the line of low water mark *as may be necessary to the full enjoyment of her riparian owners,* without impeding the *navigation or otherwise interfering with the proper use of it by Maryland, agreeably to the Compact of 1785."* (Emphasis supplied).

This award was approved, confirmed and ratified by the General Assembly of Virginia, Acts of 1877–78, Chapter 246, and by the General Assembly of Maryland, Acts of 1878, Chapter 374. The Congress of the United States likewise approved the Arbitration Award of 1877 and thereby impliedly gave its consent and approbation to the Compact of 1785 (45th Congress, Chapter 196, Act March 3, 1879, 20 Statutes at Large, page 481).

The lines of the Black-Jenkins Award were not surveyed, and headlands in the broad Potomac estuary were indistinct. Further controversies continued until Edward B. Mathews and Wilbur A. Nelson, respectively the Geologists of Maryland and Virginia, surveyed the boundary and prepared maps which were approved by the legislative branches of the Commonwealth of Virginia and the State of Maryland.[7] The boundaries so established were somewhat more favorable to Virginia than those which were shown on the United States Coast and Geodetic Survey of 1889. The Mathews-Nelson survey was more liberal in establishing headlands, "so that the new line often strikes across open water instead of following what could be considered as simply a meandering coast line."[8]

Since all operations of defendant are well beyond low water mark on the Virginia side, it is not seen how plaintiffs can derive any right, title or interest in and to the bed of the Potomac River, or any sand, gravel or materials therein contained, beyond low water mark, under the common law, the Compact of 1785, the Black-Jenkins Award of 1877, or the Mathews-Nelson Survey.

*Section 572 of Article 27 of the Maryland Code of Public General Laws.*

Prior to 1888 mechanical dredges were relatively unknown upon the Potomac River. Sand and gravel were purchased from the owners of the fast land, dug primarily from the beaches, and rudimentarily removed by carts and barrows. With the advent of mechanical dredges taking sand and gravel from the river bed, riparian owners lost most if not all the income they had derived through the sale of materials from the beaches. At that time, and until 1930, the only known Potomac River deposits were on the Maryland side of the channel.

Chapter 362 of the Laws of 1888 of the Maryland General Assembly added a section to Article 27 "Crimes and Punishments" of the Maryland Code of Public General Laws, now appearing (as amended) as the first clause of Section 572 of that Article. It declared it to be unlawful for *"any person*[9] to dig, dredge, take and carry away any sand, gravel or other material from the bed of the Potomac River" under penalty of a fine not exceeding $300, confiscation of the dredging equipment, and imprisonment for not more than six months.

This made the shores of the Potomac the sole source (except for deposits on

7. Virginia, Ch. 477, of Laws of 1928; Maryland, Ch. 50 of Laws of 1929.

8. The Compact of 1785, Research Report No. 26 of the Maryland Legislative Council, pp. 78–79.

9. Emphasis supplied.

other waters, or inland deposits) of sand and gravel, and to that extent restored to, riparian owners along the Potomac their at least potential source of income. This was enlarged by Chapter 577 of the Laws of the Maryland General Assembly of 1900. The unqualified prohibition of the 1888 act was repealed and the following exception made:

"* * * provided, however, that it shall be lawful for any riparian owner of lands bordering on said Potomac River, or for any person or corporation with whom such owner shall have a contract in writing for the purpose, or for the agents, servants or employees of such person or corporation to dig, dredge, take and carry away sand, gravel or other material from the bed of said river opposite said lands from high water mark on the shore bordering on said lands to the outer line of the channel nearest said shore, subject to the laws of the United States relating to navigation. And provided, further, that none of the provisions of this section shall be deemed to interfere in any manner with the provisions of any law of the State of Maryland relating to the taking and catching of fish and oysters." [10]

It was upon this proviso [11] that plaintiffs base their claims of trespass, and for damages. They claim that the words "*any riparian owner* of lands bordering on" "any of the navigable rivers, creeks or branches of this State" means, any owner whose property fronts upon the Potomac, whether or not such lands so fronting be in Maryland, Virginia or West Virginia. Defendant contends that the exception permitting the "riparian owner of lands bordering on *said rivers,* creeks or branches", or those claiming under them "to dig, dredge, take and carry away sand, gravel, or other material from the bed of *said river* opposite said lands from *highwater mark* on the shore bordering on said lands to the outer line of the channel nearest said shore" (italics supplied) relates only to riparian owners of land within the State of Maryland. For reasons hereinafter set forth, the court agrees with defendant's contentions.[12]

(a) *Principles of statutory construction.*

 Legislative grants of rights, powers and privileges are construed strictly against the claims of the grantee. 3 Sutherland, Statutory Construction (1943 Ed.) Sec. 6402; Mayor & City

10. By Chapter 426 of the Acts of the Maryland General Assembly of 1906, reference to the Potomac River was eliminated, and the prohibition and exception of 1900 were made applicable to all navigable waters "of this State."

11. The court inquired of counsel for plaintiffs why they had not caused criminal proceedings to be instituted against the defendant under this Section, and thus secure a ruling on Maryland law from a state court. The answer was that they did not wish to subject their clients to the risk of an action for malicious prosecution. Since lack of probable cause is an essential element of the tort of malicious prosecution, and since in Maryland advice of counsel constitutes probable cause and negatives malice (Nance v. Gall, 1946, 187 Md. 656, 671, 50 A. 2d 120, 51 A.2d 535; Moneyweight Scales Co. v. McCormick, 1909, 109 Md. 170, 180, 72 A. 537; Bishop v. Frantz, 1915, 125 Md. 183, 185, 186, 198, 93 A. 412) .

this response might seem pregnant with significant implications.

The court believes that an understandable, and less invidious, reason might well be that the opinion of the Maryland Attorney General of March 1, 1955, hereinafter mentioned, might be (or be feared to be) more authoritative in a state court criminal proceeding than in this civil suit in the United States District Court.

12. Plaintiffs and defendant both assert that the language of Article 27, Sec. 572, is "clear and unambiguous", although each contends (at least on paper) that such clarity and unambiguity inevitably necessitates a conclusion in accordance with their respective contentions. The possibility that the powers of observation and comprehension of a district judge might be more limited, led to three days of trial, two days of argument, and briefs totalling 147 pages, with appendices of 52 pages.

Council of Baltimore v. Canton Co., 1946, 186 Md. 618, 629, 47 A.2d 775; Darling v. City of Newport News, 1918, 123 Va. 14, 18, 96 S.E. 307, 3 A.L.R. 748, certiorari denied 1918, 248 U.S. 567, 39 S.Ct. 9, 63 L.Ed. 424, affirmed 1919, 249 U.S. 540, 39 S.Ct. 371, 63 L.Ed. 759; Commonwealth of Massachusetts v. State of New York, 1926, 271 U.S. 65, 46 S.Ct. 357, 70 L.Ed. 838. A state may grant to its citizens privileges in its navigable waters without extending the same privileges to the citizens of other states. McCready v. State of Virginia, 1877, 4 Otto 391, 94 U.S. 391, 24 L.Ed. 248; see also Toomer v. Witsell, 1948, 334 U.S. 385, 399–402, 68 S.Ct. 1156, 92 L.Ed. 1460.

██ Legislation by the General Assembly of Maryland is presumed to apply only to Maryland and should not be construed to apply to acts or to affect property outside the state unless expressly so stated. Sandberg v. McDonald, 1918, 248 U.S. 185, 195, 39 S.Ct. 84, 63 L.Ed. 200; Bissell Carpet Sweeper Co. v. Masters Mail Order Co. of Washington, D. C., 4 Cir., 1957, 240 F.2d 684; London Guarantee & Accident Co. v. Balgowan Steamship Co., 1931, 161 Md. 145, 150, 155 A. 334, 77 A.L.R. 1302; Miller Brothers Co. v. State of Maryland, 1954, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744, rehearing denied 1954, 347 U.S. 964, 74 S.Ct. 708, 98 L.Ed. 1106.

(b) *Inherent probabilities.*

The Act of 1888, making it criminal to dig, dredge, take and carry away sand, gravel or other material from the bed of the Potomac River was passed at a time when the only known deposits in the River were on the Maryland side of the channel. The Act was passed with only the interests of Maryland riparian owners in mind. Similarly, at the time of the modifications in 1900 and 1906, the only known benefit was to Maryland riparian owners. Indeed, some indication of the legislative concept of these amendments may be drawn from the fact that the 1906 amendment, covering the beds of "any of the navigable rivers, creeks or branches of this State" was (i) clearly couched in terms of waters of "this State," and (ii) would have been highly inappropriate as an amendment of a criminal provision with ex-State application.

Moreover, whatever may be the generous characteristics, natural or acquired, of a Maryland Legislature, this court is unable to take judicial notice, or to presume or infer, that in a situation such as this, Maryland would gratuitously confer a substantial pecuniary benefit on Virginia riparian owners on the Potomac. The court cannot assume that Maryland intended to give (what have now proven to be, but were then unknown) valuable interests in deposits of the Potomac bed in Charles County, Maryland, to residents of Virginia, who would pay to Maryland no real property or income taxes with respect thereto. Especially is this so in view of the decidedly less than brotherly love of Maryland toward Virginia[13], before, at, and after the legislation here involved.

Disputes between Maryland and Virginia at and about the times in question were frequent and violent. In two strongly-worded joint resolutions of the Maryland Legislature in 1894,[14] the conduct of the Virginia Oyster Police Force was characterized as "an invasion and violation of the territory of Maryland * * * which cannot be passed by without notice and reparation, and is deserving of our prompt condemnation", and a committee was appointed to "demand immediate and appropriate redress and restitution."

Another joint resolution,[15] in 1896, appointed a committee to secure reimbursement for the 1894 incident.

---

13. And presumably vice versa. See footnotes 14–20 inclusive.

14. Joint Resolutions Nos. 6 and 11 of the Acts of 1894, pp. 1076, 1080.

15. Joint Resolution No. 1 of the Acts of 1896, p. 859.

In 1896,[16] 1898 [17] and 1900,[18] Joint Resolutions provided for committees to meet with representatives of Virginia to discuss natural resources and boundaries. In 1902 Governor Smith of Maryland informed the General Assembly that "irregularities" existed in the administration by Virginia of the oyster laws and that trespasses were being committed in Maryland waters "by persons who are supposed to be citizens of Virginia." By Joint Resolution [19] a committee was appointed to consider the matters in question.

Eight Joint Resolutions, reflecting difficulties with Virginia, in four sessions of the Maryland General Assembly, out of a total of 55 Joint Resolutions during this period, are not indicative of a probability that valuable rights would be gratuitously conferred in Maryland territory on Virginia residents.[20]

(c) *Judicial consideration of Article 27, Section 572.*

The Maryland Court of Appeals has considered Section 572 on three occasions, but has never dealt with the point here involved.

State v. Norris, 1889, 70 Md. 91, 16 A. 445, held that the title of the Act of 1888 fulfilled constitutional requirements.

In Potomac Dredging Co. of Baltimore City v. Smoot, 1908, 108 Md. 54, 69 A. 507, the Court of Appeals held that permission to dredge granted by a life tenant by curtesy of riparian land in Maryland did not give the grantee of the permission the right to dredge against the objection of the owner who acquired the fee after such ineffective grant of permission. The Court did not decide, but assumed, that the owner of the land could grant a "right" or "license" to take sand and gravel from the waterfront or shore of his land below the high water mark.

In Smoot Sand & Gravel Co. v. Columbia Corporation, 1924, 146 Md. 384, 126 A. 91, the Court considered the right of the owner of land along the Potomac River *in Maryland* to take sand and gravel from the river bottom. The then owners of land on the *Maryland* shore of the Potomac granted to Columbia by a written instrument "the exclusive right to dig, dredge and carry away sand, gravel and other like materials from that portion of the bed of the Potomac River *up to low water mark*,[21] extending and lying in front of the property" of the grantors for a term of five years with the right to renew for an additional term of three or five years. Less than a year later and when Columbia was dredging sand and gravel from the bed of the river in front

16. Joint Resolution No. 13 of the Acts of 1896, p. 868.

17. Joint Resolution No. 1 of the Acts of 1898, p. 1287.

18. Joint Resolution No. 9 of the Acts of 1900, p. 1199.

19. Joint Resolution No. 6 of the Acts of 1902, p. 978.

20. That this unfortunate relationship has continued is demonstrated by Chapter 766 of the Acts of the Maryland General Assembly of 1957, which purports unilaterally to abrogate the Compact of 1785 by repealing, effective June 1, 1957, Chapter 1 of the Acts of the General Assembly of Maryland of 1785 by which the assent of the State of Maryland had been given to the Compact. See also Chapter 767 of the Acts of the General Assembly of Maryland of 1957, repealing, effective April 15, 1957, Chapter 484 of the Acts of the General Assembly of Maryland of 1949, which had proposed the addition of fifteen new Articles to the Compact of 1785; and Chapter 770 of the Acts of the General Assembly of Maryland of 1957, repealing and re-enacting with amendments, effective June 1, 1957, the so-called concurrent laws concerning the taking of fish, oysters, crabs and clams from the Potomac River so as to vest all licensing provisions in the State of Maryland and to give to the State of Maryland and its law-enforcement officers complete control and jurisdiction over fisheries in the Potomac and so as to eliminate any reference to "concurrent" law on the Potomac.

21. Emphasis supplied.

of the property, Smoot acquired fee simple title to the fast land and commenced to dredge in the same part of the river bed. Columbia sought to enjoin Smoot. The *nisi prius* court granted the injunction. Smoot appealed and the Court of Appeals reversed the decision. Columbia claimed that an exclusive right or privilege had been conferred by the statute upon the riparian owner and had been conveyed to Columbia before the conveyance of the fast land to Smoot. The Court of Appeals held that the statute gave the riparian owner a *permissive right* as long as he owned the land, and that this right passed to the succeeding owner of the land even though the former owner had allowed another to exercise the right.

"The beds of navigable rivers of this State unquestionably belong to the public and *unless conferred by special grant from the State, owners of adjacent lands have no exclusive right thereto below low-water mark.* Day v. Day, 22 Md. 530.

"It was *to protect the interest of the State* in the sand, gravel and other materials in the bed of the Potomac River that chapter 262 [sic] of the Acts of 1888 was passed. * * *" (146 Md. at page 388, 126 A. at page 92).

"In the first act (chapter 362 of the Acts of 1888) *all persons*[22] were included in the prohibitory clause of the statute, while in the second and last acts the riparian owner and those having a written contract with him were permitted to do the act or thing forbidden by the statute without becoming amenable to its provisions.

\* \* \* \* \* \*

"Moreover it is hardly conceivable, if it were the intention of the Legislature to grant to a *class of*

*citizens of this State* an exclusive right of the character claimed by the appellee for the one under consideration, that it would have done so by an amendment of a long standing criminal statute, by adding thereto a proviso, which it is said contains *such grant,* in that *said class of citizens* are permitted by it to do that which *all other citizens of the State* are prohibited from doing under the penalty above mentioned.

"The right conferred by the statute in question is in the nature of a *license or privilege* to the riparian owner, and those with whom he has a contract in writing, which may be revoked at any time by the Legislature. Phipps v. State, 22 Md. 380; Hess v. Muir, 65 Md. [586] 587, 5 A. 540, 6 A. 673; Powell v. Wilson, 85 Md. 347, 37 A. 216; Handy v. Maddox, 85 Md. 547, 37 A. 222." (146 Md. at page 389, 126 A. at page 92) (Emphasis added).

(d) *Opinions of the Attorney General of Maryland.*

■ The office of the Attorney General of Maryland has specifically ruled on the question before this court, holding under date of March 1, 1955, that "the exemption granted is to Maryland citizens who are riparian owners, and does not extend to and include Virginia citizens within the group excepted from the provisions of the Act * * *"[23] In an opinion of the Attorney General dated January 25, 1956, the belief was expressed "that the entire interest in the land underlying the Potomac River, from the Channel line on the Virginia side to low water mark on the Virginia side, is in the State of Maryland."

Plaintiffs strenuously urge that the opinion of March 1, 1955 is inadmissible, and in any event should be given little, if any, weight.

---

22. Emphasis by Maryland Court of Appeals.

23. Copy attached as Appendix "A" to this opinion. The Attorney General of the Commonwealth of Virginia was advised by plaintiffs' attorneys of this litigation and was given an opportunity to intervene or file a brief, but after some consideration failed to do either one.

**(1) "Admissibility".**

The opinion of March 1, 1955, was addressed to the Director of National Park Service, United States Department of the Interior, in answer to the inquiry of that official "with respect to the rights, if any, of landowners [24] in the State of Virginia bordering on the Potomac River to contract for the dredging of sand and gravel under Section 572 of Article 27 of the Annotated Code of Maryland (1951 Ed.)." Plaintiffs contend that because the Director is not one of the "boards, commissions, departments, officers and institutions" enumerated or referred to in Section 2 of Article 32A of the Maryland Code of Public General Laws, as to whom the Attorney General is expressly made "the legal adviser and representative", and to whom he is *required* to give advice, he is not *permitted* to give advice to the Director.

Of course, the impact of the opinion may well be different when it is given to a body of which the Attorney General is the duly designated legal adviser, than when it is given to one toward whom the Attorney General stands in no such relation. But in either case, it is the *opinion* of the office to which has been entrusted the "general charge, supervision and direction of the legal business of the State" (Article 32A, Sec. 2); and it has not been unusual for the Maryland Attorney General to render legal opinions to agencies of the Federal government, and to include them in his official reports. 33 Op.A.G. 155; 33 Op.A.G. 202; 40 Op.A.G. 171.

Moreover, the opinion of March 1, 1955 is in effect incorporated by reference in the opinion of the Attorney General dated January 25, 1956. The latter opinion was addressed to the Board of Public Works of Maryland, a board as to which the Attorney General is legal adviser. This would appear to legitimate the opinion of March 1, 1955, if its status were otherwise in doubt.

However, this court would want whatever benefit could be derived from an opinion of the Maryland Attorney General, regardless of the circumstances under which it was rendered. It was not "offered in evidence" any more than would be opinions of the Maryland Court of Appeals. The attenion of this court was called to the two opinions of the Attorney General, just as it was to much other material, all of which has been considered by it.

**(ii) Weight to be accorded opinions of the Attorney General.**

The interpretation of Section 572 of Article 27 of the Maryland Code of Public General Laws "is primarily the function of state authorities, judicial and administrative. The construction given to a state statute by the state courts is binding upon federal courts. * * *" Albertson v. Millard, 1953, 345 U.S. 242, 244, 73 S.Ct. 600, 602, 97 L. Ed. 983; 28 U.S.C.A. § 1652; Schumacher & Seiler, Inc., v. Sandler, 4 Cir., 1941, 118 F.2d 348. Unfortunately, however, the Maryland Court of Appeals has not passed upon the critical points in this case, so that this court must endeavor to ascertain and apply that law which it believes the Maryland Court of Appeals would (or will) hold to be applicable.

This court is not bound to follow a state decision which state courts are not bound to follow.[25] Roland Electrical Co. v. Black, 4 Cir., 1947, 163 F.2d 417, 423, 6 A.L.R.2d 82, certiorari denied 1948, 333 U.S. 854, 68 S.Ct. 729, 92 L.Ed. 1135; National Foam System v. Urquhart, 3 Cir., 1953, 202 F.2d 659, 661; Berkshire Land Co. v. Federal Security Co., 3 Cir., 1952, 199 F.2d 438, 440–441. Therefore, this court is not bound by opinions of the Maryland At-

---

24. The United States Department of the Interior holds title to lands in Virginia bordering on the Potomac River, in the vicinity of Mt. Vernon and of the properties of plaintiffs.

25. Chief Judge John J. Parker in Erie v. Tompkins in Restrospect, 1949, 35 Am. Bar Assn. Journal 19, 22.

torney General; but such opinions "should be given great consideration in determining the legislative intent." Read Drug & Chemical Co. v. Claypoole, 1933, 165 Md. 250, 257, 166 A. 742; Popham v. Conservation Commission, 1946, 186 Md. 62, 71, 46 A.2d 184; Such opinions are "entitled to substantial [26] weight and respectful consideration * * *" Mogis v. Lyman-Richey Sand & Gravel Corporation, 8 Cir., 1951, 189 F.2d 130, 140, certiorari denied 1951, 342 U.S. 877, 72 S.Ct. 168, 96 L.Ed. 659.

It seems to the court that the generalities of "substantial" or "little" weight can be interpreted only in terms of another generality—how persuasive is the reasoning in the opinion of the Attorney General.[27] The opinion of March 1, 1955 makes three points in support of its conclusion, of which the significance of the use of the term "highwater mark" in the statute seems the most telling.[28]

The exception purports to allow *"any riparian owner* of lands bordering on" "the navigable rivers, creeks or branches of this State" to dredge material "from the bed of said river opposite said lands *from highwater mark* on the shore bordering on said lands to the outer line of the channel nearest said shore * * *."

Plaintiffs get their comfort from the first underlined words; defendant from the latter.

Plaintiffs say that "any" means "all" or "every";[29] that plaintiffs are the owners in fee simple of lands bordering on the Potomac River, and that the "conclusion is inescapable" that they are embraced within the proviso. Defendant

counters with another dictionary definition [30] that "any" means "some; one out of many; an indefinite number" and is synonymous with "either * * * and is given the full force of 'every' or 'all' * * * but its generality may be restricted by the context." They point out that, although the Maryland Corrupt Practices Act, Code 1951, art. 33, § 174 makes it unlawful "for *any* corporation * * * to give [or], contribute * * * any money * * * means or aid to *any* political party, or *any* candidate for public office * * *", it was held not unlawful for the Bar Association of Baltimore City to conduct a newspaper and radio campaign in support of the "sitting judge" candidates, and to solicit contributions to defray the expenses thereof. Smith v. Higinbothom, 1946, 187 Md. 115, 48 A.2d 754.

To the court, the "license or privilege" "conferred by the statute" [31] to take materials opposite "said lands from highwater mark on the shore bordering on said lands to the outer line of the channel nearest said shore" is intended by the Act to relate only to owners of land in Maryland. First, at the time of the Acts of 1888, 1900 and 1906, the only known deposits were on the Maryland side of the channel. Second, Section 572 as amended in 1906 dealt with the "navigable rivers, creeks or branches of this State." Third, the controversies heretofore outlined between Maryland and Virginia, culminating in the attempted unilateral repeal in 1957 by Maryland of the Compact of 1785, would not lead to any interpretation under which Virginians could claim val-

---

26. The parties were unable to define how much weight is "substantial" and how little is "very little."

27. Plaintiff's contention that the Maryland Court of Appeals would accord "weight only to an opinion of the Attorney General which is contemporaneous with the legislative act that is being interpreted" is not persuasive.

28. Perhaps because the court had thought

of it independently, on a first reading of Section 572, before attention had been called to the March 1, 1955 opinion.

29. Citing Black's Law Dictionary, 3 ed., p. 119.

30. 1 Bouv.Law Dict., Rawle's Third Revision, p. 205.

31. Smoot Sand & Gravel Co. v. Columbia Corporation, supra, 146 Md. at page 389, 126 A. at page 93.

uable rights in Charles County, Maryland, from the exercise of which Maryland would receive no benefit, even indirectly. The construction adopted by the Attorney General of Maryland in the two opinions of that office would retain these benefits either for owners of Maryland riparian property,[32] or for the State itself.[33] This construction would also be consonant with the statement of the Maryland Court of Appeals in Smoot Sand & Gravel Co. v. Columbia Corporation, supra, 146 Md. at page 388, 126 A. at page 92, that the Act of 1888 was passed "to protect the interest of the State in the sand, gravel and other materials in the bed of the Potomac River * * *"; and the further reference in the same case (146 Md. at page 389, 126 A. at page 93) to the type of rights acquired under the statute by "citizens of this State."

Fourth, and most important from the standpoint of interpretation of the language per se, Maryland could not, even if it wished, grant rights to Virginia riparian owners from *highwater* mark on the Virginia shore. Maryland owns only to low water mark. The land from highwater mark to low water mark on the Virginia side is part of Virginia, and subject to its laws,[34] not those of Maryland.

In authorizing the taking of material from the bed of said river opposite "said lands from high water mark on the shore bordering on said lands," the Maryland Legislature used apt words when applied to owners of river-front property in Maryland, but completely exceeded its authority if it is sought to make them applicable to Virginia riparian owners. The area between high and low water marks is controlled by Maryland only on the Maryland side. "Said lands" must accordingly mean those lands only as to which Maryland had the power validly to make the grant which the statute recites. The land to which the statute attaches the rights must be the same as that to which the demarcation of the area within which it may be exercised is applicable, and must be the land in Maryland.[35]

32. From highwater mark to the near channel.

33. From the Virginia side of the channel to low water mark on the Virginia side.

34. Since at least 1894, Virginia has regulated the removal of sand on the banks of the Potomac. Chapter 818 of the Acts of 1893–1894 made it a felony to take, steal and carry away twenty or more bushels of sand from the land of any owner on the banks of the Potomac.

Chapter 207 of the Acts of 1920 makes it unlawful for any person to remove any deposit of sand or gravel from any part of the fast land, beach or bluff abutting upon any of the rivers, streams or waters within the jurisdiction of the Commonwealth "or from any part of the bed of such rivers, streams or other waters *between high and low water marks*."

In case any such deposit extends *uninterruptedly* from low water mark out into the bed of such water, it is likewise unlawful to remove "any part of such extended deposit lying between such low water mark and the middle line of the said waters."

An exception is made in favor of the owner of any such fast land, beach, bluff or bed of stream, upon or in front of which such deposits lie or extend, or to one acting under written permission from or contract with such owner.

35. On June 1, 1957, Chapter 498 of the Acts of the Maryland General Assembly of 1957 became effective. This amends Section 572 of Article 27 by limiting the exception therein expressly to "any riparian owner of lands in the State of Maryland * * *." As introduced, the title stated that the purpose of the bill was "to clarify the provision of said section allowing riparian owners of land in this state" to remove deposits. The recital was that the General Assembly "desires to re-affirm its intention that only the owners of riparian lands in the State of Maryland" should have the rights and privileges granted by section 572. It would have added the words "in this State", after "it shall be lawful for any riparian owner of lands * * *."

The bill was amended. The title was changed to state the purpose of the bill to be "to limit the provision of said section permitting the digging" etc. "to riparian owners of lands in the State of Maryland * * * without affecting pending litigation on the subject * *" The recital was changed to state that

There is an alternative approach which likewise defeats this claim of plaintiffs.

■ Section 2 of Article XII of the Constitution of Maryland delegates to the Board of Public Works certain powers, including the power to dispose of State property. By Section 10 of Article 78A of the Maryland Code of Public General Laws, 1951 Edition, as amended, the Board, for a consideration adequate in its opinion, may dispose of "any real or personal property of the State of Maryland * * * and any legal or equitable rights, interest, privileges or easements in, to, or over the same" which may be "sold, leased, transferred, exchanged, granted or otherwise disposed of to any person, firm, corporation * * *." It is further provided that the term "real or personal property or any legal or equitable rights, interests, privileges or easements in, to, or over the same" includes "the inland waters of the State and land under said waters." Authority is given the Board to execute deeds, leases or other evidences of conveyance. The statute does not in terms require the execution of such evidences of conveyance as a condition precedent to the validity of any disposition of the State's interest.

Defendant made application to the United States Corps of Army Engineers for a dredging permit for the area here involved, and the fact of such application was referred to the Board of Public Works. At a meeting of the Board held on March 5, 1956, attended by the Governor of Maryland, and the Comptroller, Treasurer, Director, Department of Public Improvements, Director, Department of Budget and Procurement, and the Secretary of State, defendant's application was considered, and the following minute was entered:

"The Board states that there would be no objection on the part of the State of Maryland as to the issuance of a permit for this work."

While this notation may be lacking in formality, it certainly evidences complete acquiescence on the part of the State of Maryland in the removal of sand and gravel by defendant from the area in question. Were plaintiffs' contentions as to their "ownership" of such sand and gravel sound, the Board, instead of stating that "there would be no objection on the part of the State of Maryland" should, and presumably would, have said that it was not in a position to object or fail to object.

This action of the Board is of additional positive importance. If it be correct, as the office of the Attorney General of Maryland held in the opinion of March 1, 1955:

"As to the area between the channel line nearest Virginia and the lowwater mark on the Virginia side, the State of Maryland is the owner and sand, gravel, etc. may be taken and removed only in accordance with license granted by the State"

or, as stated in the opinion of January 25, 1956:

"As we have heretofore pointed out to you in our correspondence, we believe that the entire interest in the land underlying the Potomac River, from the Channel line on the Virginia side to low water mark on

the General Assembly "desires that only owners of riparian lands which are located within the State of Maryland shall have the rights and privileges heretofore granted by said Section 572 of Article 27 of the Annotated Code * * *." Section 572 was amended accordingly.

Section 2 reads as follows:

"*And be it further enacted*, That the General Assembly here states that it has no intent in the enactment of this Law to affect the outcome of any litigation presently pending in the United States District Court for the District of Maryland."

This statement of legislative intent is gladly accepted by the court; although it would appear doubtful if even an express statement by the General Assembly of what (it now thought) Section 572 of Article 27 meant before the 1957 amendment could be accorded weight. Montgomery County v. Bigelow, 1950, 196 Md. 413, 422–423, 77 A.2d 164.

the Virginia side, is in the State of Maryland",

then the action of the Board on March 5, 1956 would be in the nature of a "license granted by the State." [36]

▊▊▊▊ Even if, contrary to said opinions and the holding of the court herein, Section 572 of Article 27 of the Annotated Code of Maryland did confer some interest upon plaintiffs, that interest, however classified, is revocable at the pleasure of the State. Smoot Sand & Gravel Co. v. Columbia Corporation, 1924, 146 Md. 384, 389, 126 A. 91. The action of the Board on March 5, 1956, would qualify as such a revocation.

In reaching a decision adverse to plaintiffs on this phase of the case, the court has not been unmindful of the other arguments advanced on their behalf. Only two of these require discussion.

▊▊▊▊ (1) Plaintiffs argue that the language of Section 7 of the Compact of 1785 "require[s] the State of Maryland to grant to the citizens of Virginia the same 'emoluments and advantages' in the Potomac River between the Virginia shore and the main channel as the citizens of Virginia have been granted by Virginia law in rivers lying wholly within the Commonwealth of Virginia.[37] Riparian owners of land bordering on the navigable waters of the State of Virginia have been granted by the provisions of Title 62, Section 181 of the Virginia Code, (1950 Edition) the same rights in the sand and gravel deposits lying in the bed of such navigable waters as those which have been granted to Maryland riparian owners under the provision of Article 27, Section 572."

The court finds nothing in the Compact of 1785 requiring Maryland to give to Virginians the same rights in Charles County, Maryland, that it gives to residents of Charles County, Maryland.

Moreover, the rights given by Virginia to its citizens in rivers lying wholly within the jurisdiction of that Commonwealth are *not* the same as those given by Maryland to its riparian owners. The Virginia statute [38] makes it unlawful to remove any deposit of sand or gravel between high and low water marks, and in the case of a deposit extending uninterruptedly [39] from low water mark out into the bed of such waters, makes it unlawful to remove "any part of such extended deposit lying between such low water mark and the middle line of the said waters"; with an exception in favor of the owner of the fast land upon or in front of which such deposits lie or extend.

▊▊▊▊ (2) Defendant's president assisted in the preparation of the Maryland Act of 1900. In recent years defendant in acquiring the right to remove sand and gravel from the Virginia side,

36. Plaintiffs' contention that the Board could grant dredging rights in the Potomac only "within the limits of the provisions of Article 27, Section 572"; only to "the abutting property owner himself or to one claiming from the abutting property owner" is not persuasive. There is no such limitation in Section 10, Article 78A of the Maryland Code, authorizing disposition of *any* real or personal property of the State of Maryland * * * and *any* legal or equitable rights, interest, privileges or easements in, to, or over the same" "to *any* person, firm [or], corporation." (Apparently *"any"* may be given "any" interpretation necessary to support plaintiffs' position. Compare footnote 28, supra). Furthermore, the contention involves a complete non-sequitur. According to plaintiffs' arguments and construction, the Board could confer rights only on those who already have them, and who therefore need no further authorization, from the Board or any one.

37. This was carried to the extreme in oral argument of contending that the Maryland Act of 1888 was "illegal ab initio" but had been "saved" by the amendments of 1900 and 1906. Strange, indeed, are the paths to salvation.

38. See footnote 34.

39. The evidence in this case is unchallenged that the deposits being worked by defendant do not extend uninterruptedly from low water mark on the Virginia shore, but lie within a line parallel to and some distance from low water mark.

in one instance between high and low water marks, and in the other, to commit waste on the fast land as well, received deeds authorizing the removal of material from the area lying between this property and the river channel.[40] Objection was made to the admissibility of this evidence, which was taken subject to exception. At the end of the case defendant moved to strike. Such motion is granted. The court has been referred to no authority, and knows of none, that contractual dealing with A on one basis estops a party to deny that the law so requires him to contract in his dealings with X. Particularly is this true in conveyancing where the grantee seeks the broadest language he can persuade the grantor to use. The situation is more nearly analogous to the rule that offers of settlement, or settlements with third parties, are not admissible to establish the validity of another suit or claim. Some courts base their decisions upon the ground that the person making the offer or settlement does so for the purpose of buying his peace and his action does not indicate a consciousness of weakness or invalidity of the claim on the part of the claimant or of fault or of liability on the part of the person against whom the claim is made. Thomson v. Austin, 1823, 2 Dowl. & Ry. 358, 361; Tennant v. Hamilton, 1839, 5 Cl. & F. 133; Harrington v. Inhabitants of Lincoln, 1855, 4 Gray, Mass., 563, 567; Sanborn v. Neilson, 1828, 4 N.H. 501, 509; Hartford Bridge Co. v. Granger, 1822, 4 Conn. 142, 148; Pentz v. Pennsylvania Fire Ins. Co., 1901, 92 Md. 444, 48 A. 139; Kalus v. Bass, 1914, 122 Md. 467, 474, 89 A. 731. Other courts rely mainly upon the policy which encourages settlement of disputes. American Law Institute's Model Code of Evidence, Section 309; Bratt v. Western Air Lines, 10 Cir., 1948, 169 F.2d 214, certiorari denied 1948, 335 U.S. 886, 69 S.Ct. 239, 93 L.Ed. 425; Winkler-Koch Engineering Co. v. Universal Oil Products Co., D.C.D.N.Y. 1947, 79 F.Supp. 1013; Hawthorne v. Eckerson Co., 2 Cir., 1935, 77 F.2d 844. These decisions and the principle of law involved are discussed in IV Wigmore on Evidence (Third Edition) Sec. 1061.

■ The court accordingly holds that plaintiffs have no cause of action against defendant, whether by way of trespass or otherwise, for the taking and carrying away by defendant of sand, gravel and other materials from the bed of the Potomac River in Charles County, Maryland, between the outer line of the channel nearest the Virginia shore and the low water mark of the Potomac River on the Virginia side. There remains the question of whether or not the manner in which defendant conducts its operations within this area constitutes an actionable nuisance with respect to the plaintiffs, or any of them.

■ Plaintiffs complain, primarily, with respect to the noise allegedly produced by defendant's operations, but also of smoke and steam generated, and the esthetic displeasure at the physical appearance of defendant's equipment. The latter two elements require little discussion.

The testimony makes it abundantly clear that the emission of smoke is not an ordinary incident of the work, and that in any event, the smoke and steam even when present, do not reach plaintiffs' properties. The esthetic aspects, even although viewed sympathetically by the court [41] certainly do not rise to the point of actionable nuisance in this case,[42] even if they might ever do so, as

---

**40.** It does not appear that dredging has been done within this latter area.

**41.** Those plaintiffs who testified made it clear that their very substantial investments in buildings and lands had been prompted largely by the scenic view along the Potomac. The houses had been designed so that each room would look out upon the River, and were located on acreage lots.

**42.** The presence of any foreign object on the Potomac would probably have been annoying to plaintiffs. The photographs of defendant's equipment showed it to be utilitarian in character and appearance, but not unsightly within those limitations.

to which there is considerable doubt.[43] See Feldstein v. Kammauf, 1956, 209 Md. 479, 121 A.2d 716; Cochran v. Preston, 1908, 108 Md. 220, 228, 229, 70 A. 113, 23 L.R.A.,N.S., 1163; Byrne v. Maryland Realty Co., 1916, 129 Md. 202, 211, 98 A. 547, L.R.A.1917A, 1216; Maryland Advertising Co. v. Mayor and City Council of Baltimore, 1952, 199 Md. 214, 223, 86 A.2d 169.

 With respect to nuisance by noise, the case of Meadowbrook Swimming Club, Inc., v. Albert, 1938, 173 Md. 641, 645, 646–647, 197 A. 146, 148, clearly establishes the law of Maryland.[44] The court, quoting with approval from the opinion in the lower court, there said:

" 'The rule which must control is whether the nuisance complained of will or does produce such a condition of things as in the judgment of reasonable men is naturally productive of actual physical discomfort to persons of ordinary sensibilities, tastes, and habits, such as in view of the circumstances of the case is unreasonable and in derogation of the rights of the party (Hamilton Corp. v. Julian, 130 Md. 597, 101 A. 558, 7 A.L.R. 746; Woodyear v. Schaefer, 57 Md. 1, 12) subject to the qualification that it is not every inconvenience that will call forth the restraining power of a court. The injury must be of such a character as to diminish materially the value of the property as a dwelling and seriously interfere with the ordinary comfort and enjoyment of it. Adams v. Michael, 38 Md. 123; Gallagher v. Flury, 99 Md. 181, 182, 57 A. 672; Euler v. Sullivan, 75 Md. 616, 618, 23 A. 845.

\* \* \* \* \* \*

" 'Of greater interest are precedents relating to nuisances due to the creation of noises. From those we find that noise alone, if it be of such a character as to be productive *of actual physical discomfort and annoyance to persons of ordinary sensibilities*, may create a nuisance, and be the subject of injunction, though such noise may result from the carrying on of a trade or business in a town or city. \* \* \*

\* \* \* \* \* \*

" 'It can scarcely be argued that any habitual noise (whether produced by skilled musicians led by the frank and cultivated leaders who testified as here, or by domestic animals as in Singer v. James, 130 Md. 382, 100 A. 642) which is so loud, continuous, insistent, not inherent to the character of the neighborhood, and unusual therein, that normal men, women, and children when occupying their own homes however distant, are so seriously incommoded that they *cannot sleep, study, read, converse, or concentrate until it stops* is not an unreasonable, unlawful, invasion of their rights. The injunction prayed must therefore issue.' " (Emphasis supplied.)

 The plaintiffs Edward M. Bostick, and Henry I. Altshuler and Roselina R. Altshuler, testified generally as to the clanking of the dredge buckets; the rattling of rocks down aluminum vents; and repeated shrill, intermittent whistles. Sound recordings were taken on the Altshuler property, but were not offered in evidence.[45] The only specific testimony that would come within the tests of the Meadowbrook case was that of Edward M. Bostick that the noise "sometimes" woke him;[46] of the plaintiff

---

43. There is of course no element of malice within the comprehension of the "spite fence" cases; that is, plaintiffs contend that defendant's operations are offensive per se, but not designedly so.

44. Plaintiffs and defendant alike treat the law of Maryland as controlling on the question of nuisance, citing, and relying exclusively on, Maryland cases.

45. Counsel for plaintiffs said that the recordings were "self-serving", and that as they "could be played up to sound like anything", they were not offered.

46. Bostick is married and the father of

Henry I. Altshuler, who had an office in his home, that if the windows were open and the wind was in the right direction, the sound would "upon occasions" be "distracting"; and of Mrs. Altshuler that during the period of several days when two dredges were present, the noise would "make it hard to hear a person in the same room."

Plaintiffs denied any frequent passage of airplanes in their vicinity, or other loud noises, except from the twice daily whistles of an excursion boat at Mt. Vernon, Virginia, and Marshall Hall, Maryland.

Even from plaintiffs' own direct testimony briefly outlined above, the court could not find "actual physical discomfort to persons of ordinary sensibilities, tastes, and habits." The court was impressed with the sincerity of those plaintiffs who testified, but received the very definite impression that their irritation at the intrusion of industry into the sanctity of their domain had created an attitude that would not permit them dispassionately to appraise the real measure of its impact. Several instances bear this out.

(i) Altshuler was away from home during the first three weeks of the dredging operations. Although in touch with his family, he was not advised of any annoyance until he became aware of it himself on his return.

(ii) Although, as previously noted, having been distracted by the noise upon occasions, Altshuler was unable to give any accurate statement of the time dredging operations ceased for the day, as he was then usually "fully occupied" with his work.

(iii) Mrs. Altshuler, although testifying that the noise was greater during most of the time there were two dredges present, was not able to fix the exact times, because she was entertaining house guests, and was "too busy to notice what was going on in the River." Nor did she testify that any of the guests were annoyed.

(iv) The incident of the second dredge is significant in this connection. After the case had been closed, except for argument, plaintiffs filed a motion to reopen for further testimony, and in support thereof filed an affidavit that "from time to time" and "specifically * * * beginning April 22, 1957 and ending April 24, 1957" two dredges were operated by defendant. The court reopened the case. Those of the plaintiffs who testified were unable to say that the two dredges operated simultaneously, except as that may be inferred from Mrs. Altshuler's testimony that the noise was greater during most of the time the two dredges were there. The testimony of defendant's River Superintendent, supported by the logs of the dredges, established to the court's complete satisfaction that the second dredge was brought in to replace the first, which had broken down; that the two dredges were present together less than two days; and that at no time were two dredges operated simultaneously in front of plaintiffs' properties.

(v) The dredging operations were conducted between one-third and one-half mile off-shore. None of the plaintiffs went out and observed the actual physical operations. Had they done so, they would have learned, as the court finds as facts, that the gravel was not discharged in contact with metal, but that the gravel was handled in chutes lined with one-half inch of rubber; was covered with water; and discharged into scows with a three-inch wooden liner.[47]

(vi) The plaintiffs Wickes and McDonnell did not appear in court, or testify. Their counsel explained that their houses were not right on the edge of the bluff, and the "noise did not come

---

two children, one three years old, and the other, one year old. There was no testimony as to the effect of the operations upon his wife and these members of the family.

47. Defendant did not claim these linings were used to deaden noise, but only that they were necessary to reduce wear.

through to them"; and that the other plaintiffs "could not persuade them" to come to court on this phase of the case.

Decibel [48] readings taken by an expert on behalf of defendant entirely satisfy the court that objectively the sounds pro- duced by defendant's operation were well within the range of reasonable tolerance, and compared not unfavorably with noises to which plaintiffs would have been subjected entirely apart from defendant's operations.[49]

48. A decibel represents the minimum change in sound detectable by the human ear. Each increase of three decibels represents a doubling of the intensity. For example, if 3 decibels equal an intensity of X, 6 decibels would equal 2X; 9 decibels 4X; 12 decibels 8X; etc. Maryland side. 5 were placed at between one and one-half and three miles north of the point of observation; 7 between one and one-half and three miles south; 5 between one and one-half and three miles east; and 3 between one and one-half and three miles west.

49. The witness testified that according to recognized and accepted standards the indicated decibel levels represented the following equivalents:

| 15 | quiet whisper |
| 30— 35 | very soft music |
| 50— 60 | conversational speech |
| 67— 68 | average home radio |
| 70 | average orchestra |
| 75 | typewriters in closed room |
| 100—110 | thunder |

He first took readings from the sea wall on the Wickes property, adjacent to Mt. Vernon. These showed as follows:

| Time | Source of Noise | Decibel reading |
| --- | --- | --- |
| 9.53 a. m. | airplane down river, high | 68 |
| 10.03 | airplane in distance | 58 |
| 10.14 | 8 blasts of dredge whistle | 58 |
| 10.45 | airplane, Virginia side | 70 |
| 10.56 | general, including dredge | 57 |
| 11.02 | airplane, Virginia side | 78 |
| 11.05 | general, dredge predominant | 58 |
| 11.07 | airplane, Maryland side | 65–70 |
| 11.24 | voice, ten feet behind meter | 69–71 |
| 11.30 | general, dredge predominant | 66 |
| 11.33 | airplane, Virginia side | 68–82 |
| 11.35 | general, dredge predominant | 62 |
| 11.40 | airplane, Maryland side | 64–72 |
| 11.47 | general, dredge predominant | 60 |
| 11.53 | airplane, Virginia side | 64–68 |
| 11.57 | excursion boat whistle, Marshall Hall, Md. | 66–69 |
| 12.00 noon | jet, downstream | 70 |
| 12.05 | Capital Airlines "Viscount" | 68–70 |
| 12.17 | excursion boat whistle, Mt. Vernon | 96 |
| 12.20 | airplane downstream | 68–70 |
| 12.32 | excursion boat whistle, Mt. Vernon | 98 |

From a rowboat in front of Wickes, 200 feet from shore:

| Time | Source of Noise | Decibel reading |
| --- | --- | --- |
| 1.47 p. m. | airplane, up river | 78 |
| 1.48 | general | 56 |
| 1.49 | creak of boat | 58 |
| 1.50 | dredge and airplane | 60–66 |
| 1.55 | general | 62 |

One week previously, a count during the period 11.45 a. m.—4 p. m. from the Wickes seawall showed an average of over seventeen planes passing per hour, of which 49 were identified as military planes; 25 were overhead; 5 were in the center of the river; and 41 on the

From this location the approximate distances to the following airports are: Washington National, 9 miles; Anacostia Naval Base, 9 miles; Bowling Field, 9 miles; Belvoir, 3 miles; Quantico, 17 miles; and Andrews, 17 miles.

The court therefore finds as a fact and concludes as a matter of law that the manner in which defendant's operations are conducted does not constitute an actionable nuisance [50] as to the plaintiffs, or any of them.

Let final judgment be entered for defendant on the first, second and third causes of action pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, as the claim for relief presented in count four is a claim distinct and separate from the claims for relief presented in counts one, two and three and as there is no just reason for delay of the entry of final judgment as to counts one, two and three.

The foregoing opinion embodies findings of fact and conclusions of law considered essential by the court under Rule 52(a) of the Federal Rules of Civil Procedure. The parties may, if they desire, submit additional proposed findings.

APPENDIX "A"

"THE STATE LAW DEPARTMENT
"10 Light Street
"Baltimore, Maryland
"March 1, 1955
"Mr. Conrad L. Wirth, Director
"National Park Service
"U. S. Department of the Interior
"Washington 25, D. C.

"Dear Mr. Wirth:

"By your recent letter you ask our views with respect to the rights, if any, of landowners in the State of Virginia bordering on the Potomac River to contract for the dredging of sand and gravel under Section 572 of Article 27 of the Annotated Code of Maryland (1951 Ed.)

"As you are doubtless aware, the boundary line of the State of Maryland and the State of Virginia has been the subject of discussion and controversy in the past. An excellent summary of the background and eventual determination of the controversy may be found in a work entitled 'The Boundary Line Between Virginia and Maryland' by Mathews & Nelson, published in 1928. The ultimate award of the arbitration in 1877 in item 4 of the explanatory remarks gave Maryland full dominion over the soil to the low water mark on the south shore of the Potomac, but with the right to Virginia to have *use of the river* to enjoy her riparian ownership. Mathews & Nelson, page 37.

"See also State of Maryland v. State of W. Va., 217 U.S. 1, 30 S.Ct. 268, 54 L.Ed. 645; State of Maryland v. State of W. Va., 217 U.S. 577, 30 S.Ct. 630, 54 L.Ed. 888; and Morris v. United States, 174 U.S. 196, 19 S.Ct. 649, 43 L.Ed. 946.

"The decided cases clearly fix the boundary of Maryland at the low water mark on the Virginia shore. Virginia has never asserted the power to grant ownership in the soil underlying the river to private persons and, indeed, the extent of Virginia's claims seem to have been a claim of political jurisdiction over the river, as distinct from the soil under the river. State of Maryland v. State of W. Va., 217 U.S. 1, 30 S.Ct. 268, 54 L.Ed 645; State of Maryland v. State of W. Va., 217 U.S. 577, 30 S.Ct. 630, 54 L.Ed. 888.

"The beds of navigable streams within the boundary of the State of Maryland belong to the public and owners of adjacent land have no right to take sand or gravel, or license others to do so, in the absence of special grant from the State. Potomac Dredging Co. of Baltimore City v. Smoot, 108 Md. 54, 69 A. 507; Smoot Sand & Gravel Co. v. Columbia Corp., 146 Md. 384, 126 A. 91; 56 American Jurisprudence 'Waters', sec. 466, pp. 880–881.

"In Maryland the State's right to protect its property in the sand and gravel underlying its rivers is asserted by pro-

---

50. There is no proof whatever of any decrease in the value of plaintiffs' properties. It might also be noted that defendant's operations ceased at about 4.30 p. m. on Monday through Friday, and earlier on Saturday. These operations were conducted on a single-shift basis. The uncontradicted testimony was that at other locations, where two shifts were employed, part of the crew slept on board during operations.

viding criminal penalties. Section 572 of Article 27 of the Maryland Code (1951 Ed.). This Section makes it unlawful to dig, dredge, take or carry away sand, gravel or other materials from the beds of navigable streams under penalty of a fine of $300.00, confiscation of the equipment used and a 6 month jail sentence. The section then goes on to provide that certain persons shall be excepted from the operation of the section, in the following language:

"'* * * provided, however, that it shall be lawful for any riparian owner of lands bordering on said rivers, creeks or branches, or for any person or corporation with whom such owner shall have a contract in writing for the purpose, or for the agents, servants or employees of such person or corporation to dig, dredge, take and carry away sand, gravel, or other material from the bed of said river opposite said lands from highwater mark on the shore bordering on said lands to the outer line of the channel nearest said shore, subject to the laws of the United States relating to navigation; * * *'

"The present question is whether the Legislature of Maryland intended to grant any rights to citizens of Virginia by using the phrase 'riparian owner', or whether that phrase has reference *only* to Maryland citizens who are riparian owners.

"It is our opinion that the exemption granted is to Maryland citizens who are riparian owners, and does not extend to and include Virginia citizens within the group excepted from the provisions of the Act. We believe this conclusion is supported by the following considerations:

"(a) The exception purports to allow riparian owners to take sand, gravel, etc. 'from highwater mark on the shore bordering on said lands to the outer line of the channel nearest said shore.' Clearly, as to the area between highwater mark and lowwater mark on the *Virginia* side, Maryland has no authority or jurisdiction since the State's boundary is at *lowwater* mark.

"(b) Statutes of a State have no extraterritorial effect and should not be construed to affect or relate to matters outside the legislature's territorial jurisdiction. London Guarantee & Accident Co. v. Balgowan Steamship Co., 161 Md. 145 at page 150, 155 A. 334, at page 336, 77 A.L.R. 1302; 50 American Jurisprudence 'Statutes' Sec. 485, pp. 508–510. When a Maryland statute speaks of 'riparian owner' it means a *Maryland* riparian owner, in view of the territorial limitation on State statutes.

"(c) Where Maryland's Legislature has created rights of Virginia citizens in the Potomac River, or has attempted to include citizens of Virginia within its laws, it has done so by *concurrent legislation* passed by the legislatures of both States. See Acts of 1945, Chapter 929 and Acts of 1912, Chapter 4, for general concurrent legislation with respect to the Potomac River. The present form of the concurrent legislation with respect to the Potomac River may be found in Article 66C of the Annotated Code of Maryland, Section 657.

"In summary, we believe that the rights to the sand and gravel in the Potomac River are as follows under the law of Maryland:

"1. Maryland riparian owners on the Potomac may take, or license others to take, sand, gravel, etc. from the bed of the Potomac between highwater mark on the Maryland shore and the outer line of the channel nearest the Marylnad shore.

"2. As to the area between the channel line nearest Virginia and the lowwater mark on the Virginia side, the State of Maryland is the owner and sand, gravel, etc. may be taken and removed only in accordance with license granted by the State.

"3. As to the area between lowwater mark and highwater mark on the Virginia shore, we cannot state the relative rights of Virginia and her citizens.

"I trust the information and views herein contained are helpful to you in considering the problem of dredging rights in the Potomac River.

"Very truly yours,
"(signed) Norman P. Ramsey
"Norman P. Ramsey
"Asst. Attorney General"